UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SHOLOM GOLDSTEIN; RABBI SIMCHA GOLDSTEIN; SARAH BREINA GOLDSTEIN; SHAINA KUTTEN; SHIMON GOLDSTEIN; YECHEZKAL SHRAGA GOLDSTEIN; AVROHOM DAVID GOLDSTEIN; HENDEL LEZER; DOVY GOLDSTEIN; CHAYA CHANA HOFFMAN; YAAKOV YOSEF GOLDSTEIN; BAS-SHEVA GOLDSTEIN; MOISHE GOLDSTEIN; PERLA GOLDSTEIN; TOBY GOLDSTEIN; YISROEL YEHUDA GOLDSTEIN,<br><br>Plaintiffs,<br><br>– against –<br><br>ARAB BANK, PLC,<br><br>Defendant. | Case No.: 1:16-CV-01681 (ILG)(RML)<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiffs Sholom Goldstein, Rabbi Simcha Goldstein, Sarah Breina Goldstein, Shaina Kutten, Shimon Goldstein, Yechezkal Shraga Goldstein, Avrohom David Goldstein, Hendel Lezer, Dovy Goldstein, Chaya Chana Hoffman, Yaakov Yosef Goldstein, Bas-Sheva Goldstein, Moishe Goldstein, Perla Goldstein, Toby Goldstein, and Yisroel Yehuda Goldstein (collectively, "Plaintiffs"), by and through their undersigned counsel, for their First Amended Complaint against defendant Arab Bank, PLC ("Defendant", "Arab Bank" or the "Bank"), hereby allege as follows:

## NATURE OF ACTION

1.      Plaintiff Sholom Goldstein was injured, both physically and mentally, in the terrorist bombing of the No. 2 Egged bus in Jerusalem, Israel on August 19, 2003 (the "Egged Bus Bombing" or the "Egged Bus Attack").  The attack was carried out by operatives of the

Islamic Resistance Movement ("HAMAS"), a recognized Foreign Terrorist Organization ("FTO") since 1995, which has since claimed official responsibility for the bombing. According to the State Department, the Egged Bus Attack killed 20 individuals, five of whom were U.S. citizens, and injured another 140. Plaintiff Sholom Goldstein, a U.S. citizen was one of the 140 injured.

2.    The remaining Plaintiffs are members of plaintiff Sholom Goldstein's family – his mother, his father, his brothers and sisters – each of whom is a U.S. citizen and has been injured and caused to suffer emotional distress as a result of the Egged Bus Bombing perpetrated by HAMAS.

3.    This action for damages is brought under the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2331, et seq., against Arab Bank – a Jordanian bank headquartered in Amman, Jordan, which operated a federally licensed and regulated branch office in the State of New York from 1982 until approximately February 2005, when the Bank was fined $24 million for its failure to comply with the Bank Secrecy Act and its implementing regulations, 31 U.S.C. §§ 5311 et seq. and 31 C.F.R. Part 103. Arab Bank thereafter agreed to convert the branch into an uninsured agency that would no longer undertake U.S.-dollar clearing.

4.    Arab Bank violated the ATA (including 18 U.S.C. § 2332(d) ("JASTA")) by conspiring, aiding and abetting, and/or participating in the provision, administration and distribution of substantial and material funding, support and extraordinary banking and administrative services (including but not limited to the administration of the Saudi Committee's "universal death and dismemberment" program) to HAMAS, its "charitable" front organizations, its terrorist operatives, and their families/beneficiaries during the Second Intifada. Upon information and belief, Arab Bank knew that: (i) HAMAS was an FTO that was actively engaged

2

in terrorist activities during the Second Intifada (September 28, 2000 – February 8, 2005); (ii) HAMAS was directly affiliated with the known front organizations and terrorist operatives routinely serviced by Arab Bank; and (iii) the material funding, support and extraordinary financial services provided by Arab Bank to HAMAS and its known affiliates was a substantial, heavily relied upon, and not easily replaceable, factor in facilitating acts of international terrorism (as defined by 18 U.S.C. § 2331) perpetrated by HAMAS during the Second Intifada, including but not limited to the August 19, 2003 bombing of the No. 2 Egged Bus.

5.      The Bank's knowing and willful provision of the aforementioned material support to HAMAS and its affiliates during the Second Intifada made it possible for HAMAS to effectively finance its operations, recruit terrorists, garner legitimacy, and incentivize its operatives to perpetrate acts of international terrorism, like the Egged Bus Bombing.  Without Arab Bank's support it would have been impossible for HAMAS to effectively finance its operations.  The Bank's knowing provision of extraordinary banking and administrative services to HAMAS during the Second Intifada constituted conduct dangerous to human life – and particularly the lives of Plaintiffs.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. This Court also has subject matter jurisdiction over Plaintiffs' claims under 18 U.S.C. § 2333 and § 2334, because this is a civil action brought by citizens of the United States, and their estates, survivors, and heirs, who have been injured in their person, property, or business by reason of acts of international terrorism.

7.      Venue is proper in this Court under 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

8.      Arab Bank is subject to personal jurisdiction in New York under N.Y. CPLR §§ 301 and 302, and 18 U.S.C. § 2334 in conjunction with Fed. R. Civ. P. 4(k)(1)(C).

## THE PARTIES

**A.    The Plaintiffs**

9.    Plaintiff Sholom Goldstein is a citizen of the United States and of the State of New York, and he resides in Kings County. He was injured, both physically and mentally, in the bombing of the No. 2 Egged bus in Jerusalem, Israel on August 19, 2003. The Egged Bus Bombing was committed by a HAMAS terrorist and suicide bomber named Ra'ed Abd al-Hamid Misk ("Misk"), who detonated an explosive device after boarding the fully-packed bus at around 9:10 p.m.   The Egged Bus Bombing was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

10.    Plaintiff Rabbi Simcha Goldstein is a citizen of the United States and of the State of New York, and he resides in Kings County. He is the father of Sholom Goldstein.

11.    The injury caused to his son in the Egged Bus Bombing has caused him to suffer mental anguish, trauma, emotional pain and suffering and emotional distress.

12.    Plaintiff Sarah Breina Goldstein is a citizen of the United States and of the State of New York, and she resides in Kings County. She is the mother of Sholom Goldstein.

13.    The injury caused to her son in the Egged Bus Bombing has caused her to suffer mental anguish, trauma, emotional pain and suffering and emotional distress. At the time of the Egged Bus Attack, Plaintiff Sarah Breina Goldstein was pregnant, and her husband initially tried to shield her from news of the attack. When she saw a picture of the hollowed-out bus, however, she experienced such distress that she was suddenly forced into labor. Two days after the attack, she gave birth to her son at 37 weeks.

14.    Plaintiffs Sholom Goldstein, Rabbi Simcha Goldstein, and Sarah Breina Goldstein have spent substantial amounts of money on healthcare for Sholom Goldstein since the attack. These out-of-pocket expenses are, upon information and belief, continuing in nature.

15.     Plaintiff Shaina Kutten is a citizen of the United States and of the State of New York, and she resides in Kings County. She is the sister of Sholom Goldstein.

16.     The injury caused to her brother in the Egged Bus Bombing has caused her to suffer mental anguish, trauma, emotional pain and suffering and emotional distress.

17.     Plaintiff Shimon Goldstein is a citizen of the United States and of the State of New York, and he resides in Kings County. He is the brother of Sholom Goldstein.

18.     The injury caused to his brother in the Egged Bus Bombing has caused him to suffer mental anguish, trauma, emotional pain and suffering and emotional distress.

19.     Plaintiff Yechezkal Shraga Goldstein is a citizen of the United States and resides in Israel. He is the brother of Sholom Goldstein.

20.     The injury caused to his brother in the Egged Bus Bombing has caused him to suffer mental anguish, trauma, emotional pain and suffering and emotional distress. He was in Israel at the time of the attack and witnessed first-hand Sholom Goldstein's struggles in the immediate aftermath of the Egged Bus Bombing.

21.     Plaintiff Avrohom David Goldstein is a citizen of the United States and of the State of New York, and he resides in Kings County. He is the brother of Sholom Goldstein.

22.     The injury caused to his brother in the Egged Bus Bombing has caused him to suffer mental anguish, trauma, emotional pain and suffering and emotional distress. He was in Israel at the time of the attack and witnessed first-hand Sholom Goldstein's struggles in the immediate aftermath of the Egged Bus Bombing.

23.     Plaintiff Hendel Lezer is a citizen of the United States and of the State of New York, and she resides in Kings County. She is the sister of Sholom Goldstein.

24.     The injury caused to her brother in the Egged Bus Bombing has caused her to suffer mental anguish, trauma, emotional pain and suffering and emotional distress.

25.     Plaintiff Dovy Goldstein is a citizen of the United States and of the State of New York, and he resides in Kings County. He is the brother of Sholom Goldstein.

26.     The injury caused to his brother in the Egged Bus Bombing has caused him to suffer mental anguish, trauma, emotional pain and suffering and emotional distress.

27.     Plaintiff Chaya Chana Hoffman is a citizen of the United States and of the State of New York, and she resides in Kings County. She is the sister of Sholom Goldstein.

28.     The injury caused to her brother in the Egged Bus Bombing has caused her to suffer mental anguish, trauma, emotional pain and suffering and emotional distress.

29.     Plaintiff Yaakov Yosef Goldstein is a citizen of the United States and of the State of New York, and he resides in Kings County. He is the brother of Sholom Goldstein.

30.     The injury caused to his brother in the Egged Bus Bombing has caused him to suffer mental anguish, trauma, emotional pain and suffering and emotional distress.

31.     Plaintiff Bas-Sheva Goldstein is a citizen of the United States and of the State of New York, and she resides in Kings County. She is the sister of Sholom Goldstein.

32.     The injury caused to her brother in the Egged Bus Bombing has caused her to suffer mental anguish, trauma, emotional pain and suffering and emotional distress.

33.     Plaintiff Moishe Goldstein is a citizen of the United States and of the State of New York, and he resides in Kings County. He is the brother of Sholom Goldstein.

34.     The injury caused to his brother in the Egged Bus Bombing has caused him to suffer mental anguish, trauma, emotional pain and suffering and emotional distress.

35.     Plaintiff Perla Goldstein is a citizen of the United States and of the State of New York, and she resides in Kings County. She is the sister of Sholom Goldstein.

36.     The injury caused to her brother in the Egged Bus Bombing has caused her to suffer mental anguish, trauma, emotional pain and suffering and emotional distress.

37.     Plaintiff Toby Goldstein is a citizen of the United States and of the State of New York, and she resides in Kings County. She is the sister of Sholom Goldstein.

38.     The injury caused to her brother in the Egged Bus Bombing has caused her to suffer mental anguish, trauma, emotional pain and suffering and emotional distress.

39.     Plaintiff Yisroel Yehuda Goldstein is a citizen of the United States and of the State of New York, and he resides in Kings County. He is the brother of Sholom Goldstein.

40.     The injury caused to his brother in the Egged Bus Bombing has caused him to suffer mental anguish, trauma, physical and emotional pain and suffering and emotional distress. He was born at 37 weeks on August 21, 2003, two days after the Egged Bus Bombing, when his mother suffered such emotional distress that she was forced into labor.

**B.    The Defendant Arab Bank**

41.     Defendant Arab Bank is a Jordanian bank with headquarters in Amman, Jordan, the common stock of which is traded publically on the Amman Stock Exchange. The Bank is majority owned and controlled by shareholders of Arab Bank Group, a Jordanian holding company, together with which it constitutes a single Jordanian banking institution.

42.     Arab Bank was founded in Jerusalem in 1930 by the Shoman Family, members of which maintained key roles in its management until August 2012. For approximately thirty years prior to his death on July 5, 2005, Abdul Majeed A.H. Shoman served as the Chairman of Arab Bank and Arab Bank Group.  His son, Abdel Hamid A.M. Shoman, who served as Deputy

Chairman and Chief Executive Officer of Arab Bank and Arab Bank Group during much of his father's time as Chairman, was thereafter elected to fill his father's shoes, before resigning in August 2012.

43.     Arab Bank owns, controls, and/or operates more than 600 branches, across five continents, in financial markets such as London, Dubai, Singapore, Geneva, Paris, Frankfurt, Sydney and Bahrain. It also conducts business in, and is registered to conduct business under the laws of, the State of New York.

44.     Arab Bank has long maintained a physical presence in the United States, having operated a wholly-owned branch office at 520 Madison Avenue, New York, New York from 1982 to approximately February 2005. Arab Bank designated the New York branch as a wholesale bank, responsible for the provision of clearing and correspondent bank services to Arab Bank's worldwide branches and affiliated banking institutions, in addition to other foreign banks. In fact, while operational, the New York Branch of the Bank was tasked with the clearing of all of the worldwide branches' U.S. dollar transactions, which includes the many transactions detailed herein. During this time period, the operations of the Bank's New York branch were regulated by the Controller of the Currency of the United States Treasury Department.

45.     Arab Bank continues to conduct business in New York at its Madison Avenue location, but has operated as a regulated federal agency since approximately February 2005, engaging primarily in trade finance. The impetus behind the Bank's conversion of the New York Branch to an uninsured agency was detailed in the February 25, 2005 announcement of the U.S. Office of the Comptroller of the Currency (the "OCC"), which ordered the New York Branch of the Bank to halt its traditional banking activities, including the transfer of funds and the opening

8

of accounts, having determined that the branch "had internal control weaknesses, particularly with regard to its international funds transfer activities."

46.     The OCC order characterized "the inadequacy of the branch's controls over its funds transfer business" as "especially serious", and was followed by an August 17, 2005 Joint Release by the OCC and the Financial Crimes Enforcement Network ("FinCEN"), announcing that each had "assessed a $24 million civil money penalty against the New York Branch of Arab Bank for violations of the Bank Secrecy Act[,]" which would both "be satisfied by a single $24 million payment to the U.S. Department of the Treasury." In taking such action, the OCC and FinCEN "determined that the New York Branch of Arab Bank failed to implement an adequate anti-money laundering program to comply with the Bank Secrecy Act and manage the risks of money laundering and terrorist financing in connection with United States dollar clearing transactions." It was also determined that the New York Branch had violated the suspicious activity reporting requirements of the Bank Secrecy Act.

## FACTUAL ALLEGATIONS

### HAMAS Is a Terrorist Organization That Conducts Terrorist Attacks Against Israel.

47.     HAMAS, which is both an acronym for *Harakat al-Muqawama al-Islamiya* (Islamic Resistance Movement) and an Arabic word meaning "zeal", is a radical Palestinian Islamist terrorist organization that was founded by Sheikh Ahmed Yassin in December 1987, during the First Intifada. Yassin served as HAMAS' spiritual leader from the time of its inception until his death on March 22, 2004.

48.     As set forth in its Charter, HAMAS' overriding goal is to destroy the State of Israel through *jihad* – religiously sanctioned and violent resistance against perceived enemies of Islam, including Israel and the United States – and to establish in its place an Islamist Palestinian

state. Since its founding, HAMAS has exhibited a commitment to achieving this objective through the commission of countless acts of international terrorism against both military and civilian targets. In fact, from September 29, 2000 through March 24, 2004 alone, HAMAS conducted more than 52 suicide attacks, most if not all of which constituted acts of international terrorism (as defined by 18 U.S.C. § 2331), killing 288 people and wounding 1,646 more. The Egged Bus Bombing, for which HAMAS has officially claimed responsibility, was but one of these senseless attacks.

49.     As evidenced by the Egged Bus Attack, HAMAS' preferred method of terror and mass murder is the suicide bombing, whereby an individual carries an explosive into a crowded public place and then detonates the bomb, killing or maiming people within the blast radius. These bombs are typically packed with ball bearings, nails, bolts, and other shrapnel, which lodge themselves in the bodies of their innocent victims, causing pain, suffering, and often death. HAMAS and its sympathizers refer to the deplorable individuals who carry out these suicide bombings as "martyrs."

50.     With regard to structure, HAMAS is nominally divided into two separate wings: (1) a political wing which supports HAMAS' so-called "Dawa" activities (its social welfare and humanitarian efforts), which are aimed at building grassroots support and legitimacy for the organization; and (2) a paramilitary wing known as the Izz al-Din al-Qassam Brigade (the "Qassam Brigades"), which is tasked with carrying out HAMAS' violent terrorist attacks. Although distinct in responsibility, these two wings are unified in purpose, functioning together as a single entity to effectuate the overriding terrorist objectives of HAMAS as a whole.

51.     HAMAS' social services are primarily administered by a network of local "zakat" committees and other purportedly "charitable organizations" (the word "zakat" means charity in

Arabic). Upon information and belief, these committees and organizations are governed and/or controlled by HAMAS leaders and operatives, and, in turn, function as alter egos of HAMAS.

52.     These circumstances were well known to Arab Bank, which willingly maintained accounts for many of these "charitable" front organizations, including the Saudi Committee in Support of the Intifada Al Quds (the "Saudi Committee"), with which the Bank purposefully coordinated to implement and administer a "universal death and dismemberment" plan, the understood purpose of which was to incentivize participation in HAMAS and other terrorist organizations, by providing cash rewards to the families of violent "martyrs" killed during the commission or attempted commission of terrorist attacks.

53.     HAMAS also relies upon its network of "charitable" front organizations to finance its acts of international terrorism, by routinely routing significant sums of money collected externally by said "charities" (under the guise of humanitarian motives) to support its own military and operational needs.  This financing is integral to HAMAS' military and other terrorist activities.  Indeed, HAMAS relies upon these routed funds for, *inter alia*, weapons, explosives, means of transportation and communication, safehouses, and salaries for its terrorist operatives and recruiters. It is in this manner that the provision of donations and funding to HAMAS' charitable fronts serves to further HAMAS' terrorist objectives. This was the case throughout the Second Intifada, and said circumstances were well known to Arab Bank, which knew that HAMAS exercised control over the Saudi Committee and the various other front organizations it maintained accounts for, and, nevertheless, facilitated the funding and fundraising efforts of same.

54.     The United States government has designated HAMAS as a Specially Designated Terrorist ("SDT") (January 25, 1995), a Foreign Terrorist Organization ("FTO") in accordance

with Section 219 of the Immigration and Nationality Act (the "INA") (October 8, 1997), and a Specially Designated Global Terrorist Organization ("SDGTO"). HAMAS' designation as a FTO has been renewed every two years since 1997, and is publicly available on the website of the United States Department of State. Through this public designation, the United States has announced to the world that HAMAS is a terrorist organization committed to the destruction of civilized society and the murder of innocent men, women, and children. HAMAS is joined on the FTO list by some of civilization's most reviled organizations, including al-Qaeda, the Islamic State of Iraq and the Levant (ISIL), and Boko Haram.

**HAMAS' Reign of Terror During the Second Intifada.**

55.     On or about September 28, 2000, following the collapse of peace negotiations at the Camp David Summit in July 2000, HAMAS and other Palestinian terrorist organizations launched a sustained terror campaign against the State of Israel, its citizens, and other civilian tourists located in Israeli territory.

56.     This intensified campaign of terrorism was widely known as the Al Aqsa Intifada or Intifada Al Quds, which, in western parlance, has come to be referred to as the Second Intifada. From its inception in September 2000 to its conclusion on February 8, 2005, the Second Intifada was marked by a massive escalation of violence, both in terms of frequency and severity.

57.     HAMAS' participation in terrorist attacks conducted during the Second Intifada is well-recognized and well-publicized. Indeed, according to the Israel Ministry of Foreign Affairs, HAMAS was responsible for more than 50 suicide attacks in Israel from September 29, 2000 through March 24, 2004 alone. HAMAS has claimed responsibility for a vast number of these senseless suicide attacks, including the Egged Bus Bombing.

58.     The violence on the part of HAMAS conducted during the Second Intifada was intended to terrorize, intimidate, coerce, antagonize, and otherwise disorient the civilian population of Israel in an effort to influence the policy of the Israeli and American governments, by compelling their leaders to give concessions, in the form of Israeli occupied territory, to HAMAS to stop its incessant attacks.

59.     Among the numerous acts of international terrorism that HAMAS knowingly and willfully committed during the Second Intifada are the following:

a.     March 28, 2001 bombing of the Neve Yamin gas station near Kfar Saba;

b.     June 1, 2001 bombing of the Dolphinarium discotheque in Tel Aviv;

c.     August 9, 2001 bombing of a Sbarro pizzeria in Jerusalem;

d.     December 1, 2001 bombing on Ben Yehuda Street in Jerusalem;

e.     December 12, 2001 Emmanuel Settlement bus attack in the West Bank;

f.     March 7, 2002 shooting attack on the Atzmona settlement in Gaza;

g.     March 9, 2002 bombing of the Café Moment coffee shop in Jerusalem;

h.     March 27, 2002 "Passover massacre" at the Park Hotel in Netanya;

i.     May 7, 2002 bombing of the Sheffield Club in Rishon Letzion;

j.     June 18, 2002 bombing of an Egged bus at Patt Junction in Jerusalem;

k.     July 31, 2002 Hebrew University cafeteria bombing in Jerusalem;

l.     September 19, 2002 bombing of Bus No. 4 on Allenby Street in Tel Aviv;

m.     January 29, 2003 shooting attack on Route 60 near Ofra;

n.     March 5, 2003 Bus No. 37 bombing in Haifa;

o.     March 7, 2003 shooting attack at the Kiryat Arba settlement in the West Bank;

p.     April 30, 2003 bombing of Mike's Place, a bar in Tel Aviv;

q.     May 18, 2003 bombing of Bus No. 6 in Jerusalem;

13

r.      June 11, 2003 bombing of Bus No. 14A at Davidka Square in Jerusalem;

s.      June 20, 2003 shooting attack on Route 60 near Jerusalem;

t.      August 19, 2003 bombing of Bus No. 2 in Jerusalem;

u.      September 9, 2003 bombing of Café Hillel in Jerusalem;

v.      October 22, 2003 shooting in the Tel Rumeida neighborhood of Hebron;

w.      January 29, 2004 bombing of Bus No. 19 on Gaza Street in Jerusalem; and

x.      September 24, 2004 bombing of Neve Dekalim in the Gaza Strip.

**HAMAS Carries out the Egged Bus Bombing of August 19, 2003.**

60.     Shortly after 9:00 p.m. on August 19, 2003, a Palestinian suicide bomber boarded the No. 2 Egged bus in Jerusalem, Israel and detonated a five-kilogram explosive device that was packed with ball bearings.  According to the State Department, the blast killed 20 persons, five of whom were U.S. citizens, and injured another 140 individuals. Many of the victims were tourists who were returning from prayer at Judaism's holiest site, the Western Wall, when they were unsuspectingly killed or injured.

61.     The devastation caused by the Egged Bus Bombing was readily apparent. "Streets were littered with body parts, clothing, shattered glass and charred debris from the blast." Molly Moore & John Ward Anderson, *18 Killed, More Than 100 Injured*, WASH. POST, Aug. 20, 2003, https://goo.gl/BfWv5t.  The bomb "peeled up the roof of the [No. 2 Egged bus] and blew out its windows, smearing human remains on a preceding tour bus." James Bennet, Bombing Kills 18 and Hurts Scores More on Jerusalem Bus,  N.Y. TIMES, Aug. 19, 2003, http://goo.gl/qvfTpZ.  It was "one of the deadliest attacks in almost three years of conflict [in Israel]." Id. It was also one of the most devastating, producing lasting images of, *inter alia*, "a man knelt near the shattered bus to perform mouth-to-mouth resuscitation on a toddler." Id.

62.     The Egged Bus Bombing of August 19, 2003 has come to be known as "The Children's Bus Bombing" because of the large number of children who were killed or injured aboard the No. 2 Egged bus that evening.  Among those killed in the Egged Bus Attack were: Shmuel Taubenfeld, 3 months old; Shmuel Zargari, 11 months old; Tehilla Nathanson, 3 years old; Issachar Reinitz, 9 years old; Avraham Bar-Or, 12 years old; Binyamin Bergman, 15 years old; Elisheva Meshulami, 16 years old; Chava Nechama Rechnitzer, 19 years old; and Miriam Eisenstein, 20 years old. The oldest person killed in the Egged Bus Bombing was Fruma Rahel Weitz, who was 73 years old.

63.     Plaintiff Sholom Goldstein was 19 years old and studying abroad in Israel when he was severely injured in the Egged Bus Bombing.  He had been praying at the Western Wall that day, and was returning home aboard the No. 2 Egged bus when the explosion occurred, knocking him to the ground and rendering him unconscious. When he awoke, he was in terrible pain.  His entire body ached, including his arms and legs. He was covered in soot. His glasses were gone and his clothes were ripped. His jacket was covered in blood and human remains. He was hospitalized, and had his eyes bandaged for more than a day due to a scratched cornea. He also suffered a perforated eardrum, and to this day suffers from permanent hearing loss. About six months after the attack, Sholom Goldstein came home from a haircut and discovered a piece of shrapnel still lodged in his head.

64.     In addition to his physical injuries, plaintiff Sholom Goldstein was caused to suffer, and continues to experience, severe mental anguish, pain and suffering, trauma and emotional distress. For months following the attack, Sholom Goldstein experienced intense, recurrent nightmares and flashbacks about that tragic day in August 2003.  He continues to experience similar episodes to this day, and meets regularly with a rabbi and counselor to discuss

and otherwise address his ongoing stress and anxiety. He remains afraid and unwilling to travel on public transportation in Israel.

65.     Plaintiffs Sarah Breina Goldstein and Rabbi Simcha Goldstein, the mother and father of Sholom Goldstein, suffered mental anguish, emotional pain and suffering, trauma and extreme emotional distress as a result of the Egged Bus Bombing in which their son was injured. Sarah Breina Goldstein was pregnant at the time of the attack, and her doctor has stated that the emotional stress of the terrorist attack was so intense that it induced the birth of her child in the 37th week of her pregnancy.

66.     Plaintiffs Shaina Kutten, Shimon Goldstein, Yechezkal Shraga Goldstein, Avrohom David Goldstein, Hendel Lezer, Dovy Goldstein, Chaya Chana Hoffman, Yaakov Yosef Goldstein, Bas-Sheva Goldstein, Moishe Goldstein, Perla Goldstein, Toby Goldstein, and Yisroel Yehuda Goldstein also suffered mental anguish, emotional pain and suffering, trauma and extreme emotional distress as a result of the Egged Bus Bombing in which their brother was injured. Yisroel Yehuda Goldstein also suffered physical pain as a result of his birth at 37 weeks.

67.     HAMAS knowingly and willfully organized and conducted the Egged Bus Bombing, and has since claimed responsibility for the attack on multiple occasions through various websites affiliated with its paramilitary wing, the Quassam Brigades.

68.     In one such instance, HAMAS released a series of photographs of the suicide bomber, Ra'ed Abd al-Hamid Misk, identifying him as "the perpetrator of [the] suicide attack" and a "Qassam member."  On another occasion, HAMAS released the text and video recitation of Misk's living martyr's will, wherein he refers to himself as a soldier of the Qassam Brigades and discusses how he was following the orders of his brothers of the Qassam Brigades in carrying out the Egged Bus Bombing, which was merely the first in a series of planned

operations intended to avenge the death of senior HAMAS militant Abdullah Quwasme. Misk can be seen in the video will wearing the green headband of HAMAS.

69.     HAMAS also updated the Quassam Brigades' website to include Misk in its list of martyrs – noting the date of his August 19, 2003 martyrdom, and setting forth the basis of his martyr membership as "*Mujahid Qassami*," or practitioner of *jihad* and member of the Qassam Brigades.

70.     The governments of the United States and Israel have likewise acknowledged that HAMAS committed the Egged Bus Bombing.

71.     In the United States, the U.S. Department of Treasury promptly confirmed HAMAS' responsibility for the Egged Bus Attack, and made clear, on or about August 22, 2003, that "[b]y claiming responsibility for the despicable act of terror on August 19, Hamas ha[d] reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress towards peace between Israel and the Palestinian people." Press Release, U.S. Dep't of Treasury, U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities (Aug. 22, 2003), https://goo.gl/d91TYz.

72.     Meanwhile in Israel, on or about September 9, 2003, Israeli forces managed to locate and kill two "senior Hamas military wing terrorists" who were purportedly responsible for heading the HAMAS infrastructure responsible for the Egged Bus Bombing and a series of other HAMAS terrorist attacks. Id.

73.     Years later, Israeli police captured several other HAMAS operatives who were ultimately convicted for their roles in the Egged Bus Bombing, including: (1) Nassim Rashed Abd al-Wudud Za'atari; (2) Majdi Barakat Abd al-Ghafar Za'atari; (3) Abdallah Adnan Yahya Sharbati; and (4) Jalal Jamal Hilmi Yagmur (collectively referred to hereinafter as the

"Convicted HAMAS Operatives"). The sentencing and verdict reports of these convicted operatives made clear, *inter alia*, that: (1) the Egged Bus Bombing was planned, carried out and overseen by the military wing of HAMAS (the Qassam Brigades), of which Misk and the Convicted HAMAS Operatives were all members; (2) Ahmed Bader, the head of HAMAS' military wing in Hebron at the time, was actively involved in planning and coordinating the attack; (3) Misk was instructed to wear black pants, a white shirt and skullcap in order to impersonate an Orthodox Jew; and (4) the No. 2 Egged Bus line was specifically selected as the target, because it stopped next to the Novotel Hotel, which had no security and was packed with international travelers and tourists.

74.    In addition to Misk and the Convicted HAMAS Operatives, senior HAMAS commander Basel Muhammad Shafiq Abd al-Qader al-Qawasmeh ("Shafiq") was also involved in the planning, coordination and/or execution of the Egged Bus Bombing.

**Arab Bank Conspires to Finance Palestinian Terrorism.**

75.    Upon information and belief, in approximately the fall of 2000 Arab Bank knowingly joined a conspiracy and scheme to aid and support HAMAS, its operatives and its various front organizations during the Second Intifada, by implementing and managing a system or network capable of financing, encouraging and incentivizing violence for a sustained period of time, while managing to circumvent increasingly stringent banking regulations and anti-terrorism laws. The Egged Bus Bombing was an overt act in furtherance of Arab Bank's conspiracy to finance Palestinian terrorism, and was within the scope of the scheme described in greater detail below.

76.    Arab Bank's willingness to participate in this unlawful scheme can be traced back to its founders – who were also its leaders during the Second Intifada – the Shoman family. Indeed, as made clear in the biography of the Bank's founder, Abdulhameed Shoman, the

18

Shoman family "link[ed] the idea of establishing a bank to the urgent need of protecting their Arab homeland, of reinforcing their powers of resistance to colonialism and Zionism, and of assuring the Arabs of ultimate victory over those enemies." *The Indomitable Arab: The Life and Times of Abdulhameed Shoman (1890-1974) Founder of the Arab Bank*, p. 118 (1st ed. 1984).

77.     His son and Chairman of Arab Bank through the Second Intifada, Abdul Majeed Shoman was of a similar mind, having served as a vocal supporter of the Intifada and the Chairman of the Popular Committee in Support of the Palestinian Intifada.

78.     Arab Bank's support for the terrorist Intifada was not merely ideological. The Bank actively sought to provide material support to HAMAS during the Second Intifada through, *inter alia*, it's deliberate implementation of the "universal death and dismemberment" insurance scheme, with the intent of assisting the terrorist organization with recruitment of terrorists and financing of its violent operations.

**The Saudi Committee and Arab Bank's Incentivizing of Suicide Bombers With Cash Rewards**

79.     The primary (but not the only) manner in which Arab Bank and its co-conspirators sought to effectuate their illicit common scheme during the Second Intifada was through the Bank's exclusive provision of a comprehensive "insurance death benefit" program in cooperation with the Saudi Committee in Support of the Intifada Al Quds (the "Saudi Committee").

80.     The Saudi Committee was founded on or about October 16, 2000 as a private charity registered with the Kingdom of Saudi Arabia. It was established – upon information and belief, with the direct involvement, participation and approval of Arab Bank's Chairman Abdul Majeed Shoman, who had grown frustrated by the absence of a mechanism through which to transfer mounting donations that had been received to support the Second Intifada – in order to

fund the terrorist activities of HAMAS and other organizations involved in the Second Intifada. On information and belief, Mr. Shoman and the Bank continued to exert influence over the Saudi Committee throughout the Second Intifada.

81.     According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled." As was the case with HAMAS and its sympathizers, the Saudi Committee generally regarded suicide bombers, like Misk, as "martyrs."

82.     The Saudi Committee was created to function as a fundraising apparatus to subsidize and finance the Second Intifada and to bankroll HAMAS and other terrorist organizations and their related "charitable" front organizations. Arab Bank was aware of the purpose of the Saudi Committee, which, according to findings of the Congressional Research Service "served as the main conduit for Saudi financial and material aid to the Palestinian territories after its establishment . . . on October 16, 2000." CRS Report RL32499, *Saudi Arabia: Terrorist Financing Issues*, CRS-11 (September 14, 2007). Arab Bank purposefully joined the Saudi Committee to fulfill this goal by functioning as its exclusive purveyor of the "universal death and dismemberment" program.

83.     The ability of the Saudi Committee to bankroll and fuel HAMAS' violence during the Second Intifada depended upon the knowing participation of Arab Bank, as well as its international network and extensive professional expertise, experience and institutional efficiency.

84.     The Saudi Committee's "universal death and dismemberment" program involved the provision of a comprehensive "insurance death benefit" of 20,000 Saudi Riyals (the equivalent of approximately $5,316.06) to families and/or beneficiaries of Palestinian terrorists –

and specifically extended "universal coverage" (guaranteed by Arab Bank) to terrorists and their beneficiaries in the event a terrorist were to be killed during the commission or attempted commission of an attack.  These lump sum initial payments would also frequently be followed by lesser monthly payments. Irrespective of their title, these were not legitimate insurance payments, but were rather "cash rewards" for the commission of terrorist attacks during the Second Intifada.

85.     Similar cash payments would also be made to qualifying terrorist operatives injured or captured during the commission or attempted commission of attacks.  These payments, however, were of lesser value than the lump sum payments distributed to purported "martyrs" killed in furtherance of the Second Intifada.

86.     The Saudi Committee provided coverage of this nature, under the "universal death and dismemberment" program, to the HAMAS organization and its operatives during the Second Intifada.  These cash rewards were a key inducement for HAMAS terrorism (including the Egged Bus Bombing) during the Second Intifada – offering a mechanism to ease the significant financial burden that would otherwise be imposed upon the families of suicide bombers. HAMAS made its operatives and recruits well aware of this incentive throughout the Second Intifada.

87.     Upon information and belief, Misk – the suicide bomber responsible for the Egged Bus Bombing, and whose name was subsequently included on the list of "martyrs" displayed on the Quassam Brigades' website – fell within the coverage of the Saudi Committee's "universal death and dismemberment" program, thereby guaranteeing coverage for his beneficiaries, which was ultimately paid out as one or more "cash rewards" by Arab Bank.

88.     The Convicted HAMAS Operatives imprisoned in connection with the Egged Bus Bombing, and HAMAS Senior Commander Shafiq similarly fell, on information and belief, within the coverage of the "universal death and dismemberment" program.

89.     Payments were therefore made, on information and belief, to said individuals and/or their beneficiaries by Arab Bank in connection with the Egged Bus Attack.

90.     Specifically, in order to facilitate the administration of the "universal death and dismemberment" program, the Saudi Committee would first provide Arab Bank with relatively detailed lists of potential beneficiaries drawn from the ranks of the wounded, the families of "martyrs," the families of prisoners and injured operatives.  In addition to identifying potential beneficiaries, these lists would contain the names of the qualifying operatives and so-called "martyrs," limited identifying information and details regarding their imprisonment, injuries and/or deaths, and the manner of same.  Said lists were compiled by the Saudi Committee using information provided by representatives of the leading terrorist groups (including HAMAS) and their "charitable" front organizations.

91.     After consulting with the Saudi Committee and local representatives of HAMAS and other terrorist groups to confirm and approve the lists provided by the Saudi Committee, the Bank would finalize the process by adding the information from the lists into its running database of qualifying beneficiaries, before opening a bank account in each of the beneficiaries' names.  Every beneficiary qualifying to participate in the "universal death and dismemberment" program was thereafter encouraged to collect their benefits at one of the Bank's local branches.

92.     In the event a qualifying beneficiary would elect to participate in the program by collecting their supposed insurance benefit, he or she would be required to present Arab Bank

with an "official" certification from the Palestinian Authority and a unique identification number to confirm entitlement to recovery.

93.    Upon presentation to Arab Bank of satisfactory documentation, the Bank would then issue a receipt to the designated recipient of the insurance benefit.

94.    All told, the Saudi Committee paid out approximately $35,000,000 in benefits under the "universal death and dismemberment" benefit plan administered by Arab Bank between 2000 and 2004.  Said monies were raised by the Saudi Committee from private donors in Saudi Arabia and elsewhere in the Persian Gulf region, before being allocated for payment to Arab Bank in order to fulfill its public pledge of universal coverage for Palestinian terrorists.

95.    Because the Saudi Committee raised its funds in Saudi currency – which could not be easily converted into the Israeli currency most commonly utilized in Palestinian controlled areas – Arab Bank would convert the monies it received from the Saudi Committee into U.S. dollars through the Bank's New York Branch, before routing insurance benefits to the program's qualifying beneficiaries.

96.    The Bank's willing involvement in this unlawful scheme to finance and encourage Palestinian terror during the Second Intifada stretched far beyond its provision of ordinary financial services.  Not only did the Bank publicly guarantee payment of any claims made under the "universal death and dismemberment" program, it also undertook efforts to convert Saudi money received from the Saudi Committee into U.S. dollars through its New York Branch, and to conceal the fact that it was knowingly making payments to beneficiaries of individuals it knew or otherwise understood were affiliated with HAMAS.

97.     Indeed, the notion that Arab Bank administered the "universal death and dismemberment" benefit plan with knowledge of the fact that it was incentivizing terror is supported by the findings of the Congressional Research Service, which found as follows:

> The [Saudi Committee] website . . . once contained over 40,000 transaction records that featured the names [of] individuals who received humanitarian aid and financial support from the committee. . . . One of the Committee's programs supported Palestinian families whose primary breadwinners were killed by Israeli forces or under other violent circumstances during the uprising. Online records for this program contained the names of the deceased individuals, transaction numbers, the date of their deaths, their home towns, and the circumstances in which they were killed. The Committee's description of the program indicated that payments of 20,000 SR [$5,300] were transmitted to the family members of these individuals in their names following their death.
>
> Of the 1,300 names contained in the records for this specific Committee program, over 60 matched or closely resembled the names of known Palestinian militants who carried out attacks on Israeli military personnel and civilians from October 2000 to March 2002. These individuals included suicide bombers and gunmen who were killed during actual and attempted attacks inside Israel and the Palestinian territories. Most of the Committee records assigned to individuals whose names matched or closely resembled those of suicide attackers listed 'assassination' as the cause of death – however other records credited 'martyrdom.' A handful of these records indicated that the individuals they referred to were killed during a 'martyrdom operation.' The Committee removed all records from its website in early 2005.

CRS Report RL32499, *Saudi Arabia: Terrorist Financing Issues*, CRS-15-16 (September 14, 2007).

98.     The Saudi Committee's annual report, a copy of which was published in Al Jazeera on February 11, 2001, detailed payments that were made to Palestinian prisoners as well as Palestinian "martyrs" under the "universal death and dismemberment" program. Notably, the Saudi Committee list confirms that it paid insurance benefits to the family of at least one HAMAS suicide bomber – Musa Abd al-Qadir Ghanimat – whose cause of death was identified as "martyr".

24

99.     The Saudi Committee has likewise made "martyr" payments to the families of the HAMAS suicide attackers who perpetrated (1) the June 1 Dolphinarium bombing; (2) the August 9, 2001 Sbarro Pizzeria bombing; (3) the December 1, 2001 Ben Yehuda Street bombings; and (4) the December 12, 2001 shooting attack on Bus No. 189 in Emmanuel. *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 329 (E.D.N.Y. 2015).

100.    Upon information and belief Arab Bank and the Saudi Committee knowingly compensated families of HAMAS suicide bombers and other operatives through the "universal death and dismemberment" program throughout the Second Intifada.  Not only was it spelled out in the Saudi Committee's own records, which were, on information and belief, shared, exchanged and integrated with those of the Bank, the names of suicide bombers were also widely disseminated and publicized – via television, radio and newspaper – following each attack during the Second Intifada.

101.    Arab Bank knew who these HAMAS terrorists were and was actively rewarding them for their deplorable actions, by guaranteeing and distributing cash rewards to their families under the guise of humanitarian aid.

102.    This willingness on the part of Arab Bank, an internationally recognizable financial institution, to perform extraordinary financial and administrative services for HAMAS and the Saudi Committee, helped to legitimize, and incentivize participation in, Palestinian terrorism during the Second Intifada.

103.    By serving as the exclusive administrator of the Saudi Committee's "universal death and dismemberment" program, Arab Bank knowingly provided its co-conspirators (namely HAMAS and the Saudi Committee) with substantial and material support and assistance that was critical to the advancement of their unlawful terrorist objectives during the Second Intifada. Said

25

support and assistance included its provision of access to its computer systems, personnel, accounting services, SWIFT wire transfer membership, worldwide office locations, including the Bank's New York Branch, and various other invaluable financial resources.

104.    Absent Arab Bank's provision of the "universal death and dismemberment" program, it would have been exceedingly difficult, if not impossible, for HAMAS and/or the Saudi Committee to effectively distribute the funding necessary to underwrite HAMAS' intensified terror campaign during the Second Intifada.  It is in this respect that the Bank's seemingly innocuous banking activities were, in actuality, activities dangerous to human life. Arab Bank made it possible for HAMAS to transcend otherwise prohibitive physical obstacles (e.g., Israeli military checkpoints) and to largely eliminate the need for antiquated and ineffective means of financial distribution (e.g., couriers).  It also gave HAMAS an otherwise unavailable means through which to modernize its fundraising efforts, despite increasingly stringent banking regulations and anti-terrorism laws.  The resulting efficiencies were essential to HAMAS' ability to sustain its intensified reign of terror during the Second Intifada.

105.    By knowingly and actively participating in this insurance coverage scheme, Arab Bank has puposefully aided and abetted each and every terrorist act committed by HAMAS since the formation of the Saudi Committee's "universal death and dismemberment" program in October 2000, including the Egged Bus Bombing.

## Arab Bank's Knowing Provision of Material Support to HAMAS, Its Members, and Its "Charitable" Front Organizations

106.    In addition to administering the "universal death and dismemberment" program described above, Arab Bank also willfully provided financial services and material support to HAMAS, its operatives and its network of "charitable" front organizations throughout the Second Intifada.

107.    The Bank's provision of support to HAMAS through its "charitable" front organizations was vast during the Second Intifada, and can be traced directly to the Egged Bus Bombing, through both attempted and completed transfers from the Saudi Committee, among others.

108.    For example, on or about December, 19, 2000, Arab Bank transferred $2,655.78 in U.S. dollars to Senior HAMAS Commander Shafiq, who, on information and belief, assisted in the planning, coordination and execution of the Egged Bus Bombing.  Said monies originated from the Saudi Committee, and were, on information and belief, converted from Saudi currency by Arab Bank's New York Branch at some point in time prior to the transfer to Shafiq.

109.    Upon information and belief, this was one of many transfers to Shafiq that were facilitated by Arab Bank during the Second Intifada on behalf of HAMAS, its members and/or its "charitable" front organizations.

110.    Arab Bank was, on information and belief, aware of Shafiq's affiliation with HAMAS at all times during the Second Intifada, but nevertheless facilitated transfers to his Bank account to further HAMAS' terrorist objectives, including but not limited to the Egged Bus Bombing.

111.    Without Arab Bank's substantial and material assistance, it would have been exceedingly difficult, if not impossible, for HAMAS to effectuate conversions and transfers of foreign fundraising contributions to the extent necessary to fund its operations during the Second Intifada.

112.    The Saudi Committee also initiated a transfer through Arab Bank's New York Branch of $132.97 in U.S. dollars to suicide bomber Misk on January 13, 2004.

113.    Upon information and belief, this was one of many transfers to Misk that were facilitated by Arab Bank during the Second Intifada on behalf of HAMAS, its members and/or its "charitable" front organizations.

114.    Arab Bank was, on information and belief, aware of Misk's affiliation with HAMAS at all times during the Second Intifada, but nevertheless facilitated transfers to his Bank account to further HAMAS' terrorist objectives, including but not limited to the Egged Bus Bombing.

115.    Without Arab Bank's substantial and material assistance in this regard, it would have been exceedingly difficult, if not impossible, for HAMAS to effectuate conversions and transfers of foreign fundraising contributions to the extent necessary to fund its operations during the Second Intifada.

116.    Arab Bank and its New York Branch also maintained accounts and/or effectuated substantial and material monetary transfers to known HAMAS founders, leaders and operatives – including the leadership of the Qassam Brigades, the wing of HAMAS that was directly responsible for the planning, coordination, implementation, funding and oversight of the Egged Bus Bombing during the Second Intifada.

117.    These transfers included: (1) 7 transfers totaling $109,500 to HAMAS Co-Founder and "Supreme Leader" of the Qassam Brigades in Gaza, Salah Shehada (Arab Bank Gaza Branch, Acct. # 349321510) from November 2000 to February 2001; (2) 4 transfers totaling $144,000 to HAMAS Co-Founder and Leader Muhammad Hasan Shama'a (Arab Bank Gaza Branch, Acct. # 513636510) from January 2001 to December 2001; (3) 9 transfers totaling $173,172 to HAMAS leader and Qassam Brigades Commander Ismail Abu Shanab (Arab Bank Gaza Branch, Acct. # 236519510) from August 2000 to August 2001; and (4) 15 transfers

totaling $152,986 to HAMAS Leader Ghazi Ahmad Hamad (Arab Bank Gaza Branch, Acct. # 1170465510 / 706785) from July 2000 to January 2002.  Notably, Salah Shehada was expressly referenced by Misk in his living martyr's will as one of the great HAMAS leaders from whom he learned jihad and martyrdom.

118.    Arab Bank maintained an account in the name of Osama Hamdan, a HAMAS Leader and an SDGT since 2003, from 1998 until 2004, and processed transfers made to and from his account in the intervening years. Notably, in a series of transfers that the Bank effectuated for Hamdan in 2000 (specifically, two transfers on October 16, 2000 and another on December 29, 2000), monies were expressly made payable to either "HAMAS" or "HAMAS ORGANIZATION".  None of these transfers to HAMAS was stopped by the Bank, nor were any other transfers involving Hamdan's account following his designation as an SDGT. Not surprisingly, the Hamdan account was, on information and belief, an account through which HAMAS publically encouraged supporters to make donations.

119.    Arab Bank has admitted, on information and belief, that Hamdan was only one of eleven individuals or organizations already designated as terrorists for which the Bank maintained accounts during the Second Intifada. On information and belief, the bank processed hundreds of transfers, totaling more than $2,500,000, for these accounts alone.

120.    Upon information and belief, transfers of this nature were also effectuated to Qassam Brigades Commander Ahmed Bader, who then utilized said monies, either alone or together with monies from separate transfers to other leaders of HAMAS and the Qassam Brigades (such as the aforementioned transferees) – to fund and carry out the Egged Bus Bombing on August 19, 2003.

121.    Upon information and belief, Arab Bank was aware of the forgoing transferees' affiliations with HAMAS at all relevant times during the Second Intifada, but nevertheless facilitated said transfers to knowingly further HAMAS' terrorist objectives, including but not limited to the Egged Bus Bombing. Without Arab Bank's substantial and material assistance in this regard, it would have been exceedingly difficult, if not impossible, for HAMAS to effectuate conversions and transfers of foreign fundraising contributions to the extent necessary to fund its operations during the Second Intifada.

122.    Indeed, as Senior HAMAS Leader Abbas al-Sayed made clear to Israeli Police following the 2002 Park Hotel bombing that he helped orchestrate in Netanya – the monies HAMAS would invariably use to purchase weapons and explosives for their attacks during the Second Intifada came almost exclusively from transfers effectuated by Arab Bank through its New York Branch. Al-Sayed was quoted, as follows:

> The monies that I paid for the price of the weapons was able to achieve through a bank transfer to my personal account at the Arab Bank in Tulkarem. And these monies were sent from America to a bank account in dollars in coordination with Abu Alanur and he is from the leaders of Hamas in Syria. And the monies would arrive to finance Hamas' political activity, only in this way.

123.    Many of these transfers that Arab Bank facilitated to HAMAS' leaders and operatives during the Second Intifada were sent through "charitable" front organizations aside from the Saudi Committee.

124.    Upon information and belief, these other front organizations were alter egos of HAMAS, and also served as vehicles through which the Bank knowingly distributed substantial material support to HAMAS, its operatives and their families during the Second Intifada.

125.    Arab Bank did more than provide these entities with routine financial services – it assisted them with public fundraising campaigns, undertook efforts to convert Saudi money into

U.S. dollars through its New York Branch, and actively concealed the fact that it was knowingly effectuating transfers for recognized conduits of HAMAS for the purpose of underwriting HAMAS' terrorism during the Second Intifada.

126.    These alleged alter egos of HAMAS included: The Islamic Charity Association a/k/a Islamic Charitable Society in Hebron; Charity Committee in Ramallah a/k/a Ramallah Zakat Committee; Jenin Zakat Committee a/k/a The Charity Association in Jenin; Nablus Zakat Committee; Tulkarem a/k/a Tulkarm Zakat Committee; Orphan Care Association (Bethlehem); Qalqulia, aka Qalqiliyah Zakat Committee; Hebron Zakat Committee a/k/a Hebron Tithing and Alms Committee; Halhul Zakat Committee; Al Aslah Association in el Bireh; and Al-Tadhamun Charitable Society.

127.    Upon information and belief, each of these entities: (1) had HAMAS operatives in positions of leadership during the Second Intifada; (2) were directly connected to HAMAS military operations during the Second Intifada; (3) were treated by the Palestinian Authority as HAMAS entities during the Second Intifada; and/or (4) were recognized as "HAMAS" by the Palestinian population during the Second Intifada.

128.    Upon information and belief, Arab Bank was aware at all relevant times during the Second Intifada, that each of the foregoing front organizations was merely an alter ego of HAMAS, but nevertheless facilitated transfers for same in order to funnel money to HAMAS and further its terrorist objectives, including but not limited to the Egged Bus Bombing. Without Arab Bank's substantial and material assistance in this regard, it would have been exceedingly difficult, if not impossible, for HAMAS to effectuate conversions and transfers of foreign fundraising contributions to the extent necessary to fund its operations during the Second Intifada.

129.    Indeed, Arab Bank facilitated the transfer of at least $32,000,000 into the accounts of these HAMAS alter egos – no less than $15,000,000 of which was sent by the Saudi Committee.

130.    Included among the many transfers facilitated by Arab Bank to these HAMAS alter egos was a 2004 transfer to the Ramallah Zakat Committee from Interpal, a year after Interpal had been designated as an SDGT.  Not surprisingly, Arab Bank refrained from stopping the transfer, which, on information and belief, was affirmatively approved by an Arab Bank employee.

131.    Arab Bank likewise laundered funds for Texas-based "charity" the Holy Land Foundation for Relief and Development (the "HLF") during the Second Intifada, despite the fact that the government of Israel had designated the HLF as a HAMAS front organization in May 1997. Said monies were cleared through the Bank's New York Branch, before being deposited into the Bank accounts of various HAMAS alter egos, including the Ramallah Zakat Committee, the Tulkarem Zakat Committee and the Islamic Charity Society of Hebron, and ultimately, on information and belief, funneled to HAMAS leaders, operatives and/or their families, in furtherance of HAMAS' terrorist objectives during the Second Intifada.

132.    The HLF was convicted of providing material financial support to HAMAS in 2009, with a number of its executives being sentenced to substantial prison terms for their actions.

133.    The Bank's purposeful decision to function as a conduit for the HLF is illustrative of both the Bank's knowledge that it was underwriting HAMAS' terrorist efforts during the Second Intifada, and the invaluable nature of the extraordinary services it was willing to provide HAMAS.

32

134.   Put simply, these "charitable" front organizations played a central role in the financing of HAMAS' terror campaign during the Second Intifada, serving as additional conduits through which HAMAS could finance its terrorist operations (e.g., purchases of weapons and explosives, recruitment and training of operatives, etc.).

135.   By knowingly providing extraordinary banking and administrative services to these FTO-controlled front organizations, Arab Bank substantially assisted HAMAS in furtherance of a conspiracy to commit unlawful acts of international terrorism during the Second Intifada, including the Egged Bus Bombing, and committed numerous overt acts (set forth in greater detail herein) in furtherance of the conspiracy.

136.   Indeed, had Arab Bank refused to open its doors to HAMAS and its agents during the Second Intifada, it would have been exceedingly difficult, if not impossible, for HAMAS to effectuate conversions and transfers of foreign fundraising contributions to the extent necessary to fund its operations. By acting in the willful manner described herein, Arab Bank purposefully increased the incidence of HAMAS terror during the Second Intifada, and incentivized the conduct of suicide bombers like Ra'ed Misk.  It is in this respect that the Bank's seemingly innocuous banking activities constituted extraordinary acts dangerous to human life.

137.   By knowingly providing direct and/or indirect material support of this nature to HAMAS throughout the Second Intifada, Arab Bank is secondarily liable for all foreseeable acts committed by HAMAS during said time period.  Arab Bank is therefore secondarily liable for the damages sustained by Plaintiffs – each of whom was injured as a result of the Egged Bus Bombing.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of 18 U.S.C. §§ 2339A, 2333
### Providing Material Support to Terrorists

138.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

139.   The extraordinary financial and administrative services that Arab Bank knowingly provided to HAMAS, its leaders, operatives, terrorists and their families, its "charitable" front organizations, and its alter egos during the Second Intifada – including its exclusive administration of the Saudi Committee's "universal death and dismemberment" program for the families of suicide bombers and other qualifying terrorists – constituted material support that was intended to be used in the preparation and carrying out of violations of 18 U.S.C. § 2332 and other acts of international terrorism that have caused direct injury to the Plaintiffs.

140.   By participating in the commission of violations of 18 U.S.C. § 2339A, that have caused each of the Plaintiffs to be injured in his or her person, business, or property, and/or to be the survivor and heir of a United States national so injured, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of the Egged Bus Bombing.

### COUNT II
### Violation of 18 U.S.C. §§ 2339B, 2333
### Providing Material Support to a Foreign Terrorist Organization

141.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

142.   Arab Bank knowingly provided, attempted to provide and conspired to provide material support and resources to Foreign Terrorist Organization HAMAS and its agents throughout the Second Intifada, in violation of 18 U.S.C. § 2339B.

143.   By knowingly providing material support to HAMAS and its agents during the Second Intifada, and attempting and conspiring to do so, in violation of 18 U.S.C. § 2339B, Defendant Arab Bank is secondarily liable, pursuant to 18 U.S.C. § 2333, for any and all foreseeable acts committed by HAMAS during the Second Intifada, including the Egged Bus Bombing, and is, therefore, liable for all damages that Plaintiffs have sustained as a result of said attack.

**COUNT III**
**Violation of 18 U.S.C. §§ 2339C, 2333**
**Financing of Terrorism**

144.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

145.   The extraordinary financial and administrative services that Arab Bank knowingly, willfully and unlawfully provided to HAMAS and its agents during the Second Intifada included the purposeful collection for and provision of funds to HAMAS with the fulfilled intention that said funds be used, in full or in part, to carry out acts intended to cause death or serious bodily injury to civilians not taking part in any armed conflict, such as the Egged Bus Bombing, which, by both its nature and context, was intended to intimidate, coerce, antagonize, and otherwise disorient the civilian population of Israel, in an effort to influence the policy of the Israeli and American governments, by compelling their leaders to give or encourage concessions, in the form of Israeli occupied territory, to HAMAS to stop its incessant attacks.

146.   Because it willfully violated 18 U.S.C. § 2339C, Defendant Arab Bank is secondarily liable to Plaintiffs, pursuant to 18 U.S.C. § 2333, for all damages that they sustained as a result of the Egged Bus Bombing.

**COUNT IV**
**Violation of 18 U.S.C. §§ 2332(b), 2332(c), 2332(d) (JASTA), 2333**
**Aiding and Abetting the Attempted Murder and Physical Injury of United States Citizens**

147.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

148.    Plaintiffs were injured – directly or indirectly – in their person, property, or business by reason of the Egged Bus Bombing – a violent act of international terrorism committed by HAMAS during the Second Intifada, in violation of the criminal laws of the United States, including the prohibition against killing, attempting to kill, conspiring to kill, and engaging in physical violence with the intent to cause, and actually causing, serious bodily injury to a United States national, as set forth in 18 U.S.C. §§ 2332(b) – (c).

149.    This deplorable act of HAMAS was intended to intimidate and coerce the civilian population of Israel, to influence the policy of the governments of Israel and the United States by intimidation and coercion, and to affect the conduct of the governments of Israel and the United States by mass destruction, assassination, or kidnapping. It also occurred primarily outside the territorial jurisdiction of the United States, and transcended national boundaries in terms of the means by which it was accomplished, the individuals it intended to intimidate and coerce, and the locale in which the perpetrators operated and/or sought asylum.

150.    The Egged Bus Bombing was an extreme and outrageous act of international terrorism that was committed by HAMAS with the knowledge of, intent to cause, and actual result of causing extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those physically injured in the attack.

151.   As set forth in greater detail above, Arab Bank provided substantial assistance to HAMAS throughout the Second Intifada with the knowing purpose of aiding and abetting HAMAS in the commission of acts of international terrorism, including the Egged Bus Bombing. This substantial assistance was heavily relied upon by HAMAS, and was indisputably important to the organization's ability to fund its intensified terrorist objectives during the Second Intifada, including the Egged Bus Bombing.

152.   Absent such substantial assistance from the Bank, it would have been exceedingly difficult, if not impossible, for HAMAS to effectuate conversions and transfers of foreign fundraising contributions to the extent necessary to fund its operations during the Second Intifada.  Put simply, Arab Bank actively encouraged HAMAS terrorists to engage in violence during the Second Intifada. The Egged Bus Bombing was a direct and foreseeable result of the material support and substantial assistance from Arab Bank.

153.   By aiding and abetting violations of 18 U.S.C. § 2332, Defendant Arab Bank is liable pursuant to 18 U.S.C. § 2333 for any and all damages sustained by Plaintiffs as a result of the Egged Bus Bombing.  At the very least, Arab Bank was generally aware that it was playing an active role in HAMAS' reign of terror during the Second Intifada through its provision of substantial assistance  to the terrorist organization that injured Plaintiffs.

### COUNT V
### Violation of 18 U.S.C. §§ 2332(b), 2332(d) (JASTA), 2333
### Conspiracy to Commit Murder, Attempted Murder of United States Citizens

154.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

155.   Plaintiffs were injured – directly or indirectly – in their person, property, or business by reason of the Egged Bus Bombing – a violent act of international terrorism committed by HAMAS during the Second Intifada, in violation of the criminal laws of the

United States, including the prohibition against attempting to kill and conspiring to kill a United States national, as set forth in 18 U.S.C. § 2332.

156.    This deplorable act of HAMAS, was intended to intimidate and coerce the civilian population of Israel, to influence the policy of the governments of Israel and the United States by intimidation and coercion, and to affect the conduct of the governments of Israel and the United States by mass destruction, assassination, or kidnapping. It also occurred primarily outside the territorial jurisdiction of the United States, and transcended national boundaries in terms of the means by which it was accomplished, the individuals it intended to intimidate and coerce, and the locale in which the perpetrators operated and/or sought asylum.

157.    The Egged Bus Bombing was an extreme and outrageous act of international terrorism that was committed by HAMAS with the knowledge of, intent to cause, and actual result of causing extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those physically injured in the attack.

158.    Arab Bank knowingly conspired, combined and agreed to conspire and combine with other persons, including HAMAS, to act unlawfully in violation of 18 U.S.C. § 2332, as set forth in greater detail above. Arab Bank also committed overt acts in furtherance of the conspiracy, which functioned to cause harm to the Plaintiffs in this action.

159.    Arab Bank knew that the material support and the extraordinary banking and administrative services it was providing to HAMAS and its agents would be used in furtherance of the conspiracy. At all relevant times, the Bank likewise knew of the conspiracy, the terrorist affiliations of its co-conspirators (including HAMAS), and the roles of all organizations and individuals involved.

160.     Defendant Arab Bank knowingly and purposefully agreed (either expressly or tacitly) to provide substantial financial services and material support to HAMAS and its leaders, operatives, agents, families and front organizations. This material support was willfully provided with the knowing purpose that said assistance facilitate the activities of HAMAS and its leaders during the Second Intifada pursuant to a common scheme to encourage and otherwise incentivize acts of international terrorism, like the Egged Bus Bombing, which was a direct and foreseeable result of the material support and substantial assistance HAMAS received from Arab Bank.

161.     Were it not for the Bank's willful participation in this scheme, it would have been exceedingly difficult, if not impossible, for HAMAS to effectuate the "universal death and dismemberment" program or to facilitate conversions and transfers of foreign fundraising contributions to the extent necessary to fund its operations during the Second Intifada.

162.     By conspiring with HAMAS and its leaders, operatives, agents, families and front organizations (including but not limited to the Saudi Committee) to support, encourage, and facilitate violations of 18 U.S.C. § 2332(b) that have injured Plaintiffs, either directly or indirectly, Arab Bank is liable to Plaintiffs, pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of the Egged Bus Bombing.  At the very least, Arab Bank was generally aware that it was playing an active role in HAMAS' reign of terror during the Second Intifada through its active participation in, and conduct in furtherance of, the aforementioned scheme.

## JURY DEMAND

163.     Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.      Enter judgment against Arab Bank and in favor of each Plaintiff for compensatory and other damages in such amounts for each named Plaintiff as are allowed by applicable law and as shall be determined at trial;

b.      Enter judgment against Arab Bank and in favor of each Plaintiff for treble damages of each amount awarded pursuant to the previous prayer for relief, and pursuant to 18 U.S.C. § 2333;

c.      Enter judgment against Arab Bank and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution on this action, including attorneys' fees incurred in bringing this litigation, pursuant to 18 U.S.C. § 2333;

d.      Enter an order declaring that Arab Bank has violated the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

e.      Grant such other and further relief as this Court deems just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Dated:  May 7, 2018                                Respectfully submitted,

                                                   **HERZFELD & RUBIN, P.C.**

                                                   Brian T. Carr, Esq. (BC-2519)
                                                   Michael R. Rudick, Esq. (MR-1785)
                                                   HERZFELD & RUBIN, P.C.
                                                   *Attorneys for Plaintiffs*
                                                   125 Broad Street
                                                   New York, New York 10004
                                                   (212) 471-8500
                                                   bcarr@herzfeld-rubin.com
                                                   mrudick@herzfeld-rubin.com