UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHOLOM GOLDSTEIN, et al.

               Plaintiffs,

      – against –

ARAB BANK, PLC,

             Defendant.

1:16-CV-01681 (ILG)(RML)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND FOR FAILURE TO STATE A CLAIM PURSUANT TO RULES 12(B)(2) AND 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Respectfully submitted,

**HERZFELD & RUBIN, P.C.**
125 BROAD STREET
NEW YORK, NEW YORK 10004
(212) 471-8500

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL ALLEGATIONS IN THE FIRST AMENDED COMPLAINT .................. 2

LEGAL ARGUMENT ....................................................................................... 5

    I.   THIS COURT HAS PERSONAL JURISDICTION OVER ARAB BANK ..................... 5

        A.  Applicable Legal Standard on Motion to Dismiss for Lack of Personal
            Jurisdiction .................................................................................... 6

        B.  New York's Long-Arm Statute Authorizes this Court to Exercise Specific
            Jurisdiction Over Arab Bank .......................................................... 6

        C.  Fed. R. Civ. P. 4(k)(1)(C) Provides an Additional Statutory Basis for this Court
            to Exercise Personal Jurisdiction Over Defendant .......................... 11

        D.  The Exercise of Personal Jurisdiction Over Arab Bank Will Not Offend
            Traditional Notions of Fair Play and Substantial Justice .............. 11

    II.  THE FIRST AMENDED COMPLAINT SHOULD NOT BE DISMISSED FOR
        FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED ........ 13

        A.  The Applicable Legal Standards on a Rule 12(b)(6) Motion to Dismiss ................. 13

        B.  Plaintiffs Have Sufficiently Pled their Primary Liability Claims (Counts I – III) ...... 14

            1.  Plaintiffs Plausibly Allege that the Bank Committed "An Act of
               International Terrorism" .......................................................... 17

            2.  Plaintiffs Plausibly Allege Proximate Causation for their Primary Liability
               Claims ................................................................................... 20

        C.  Plaintiffs Have Sufficiently Pled their Secondary Liability Claims (Counts IV-
            V) ............................................................................................ 24

            1.  Plaintiffs Plausibly Allege that the Bank Conspired with "The Person Who
               Committed" the Egged Bus Bombing ...................................... 26

            2.  Plaintiffs Plausibly Allege that the Bank  Aided and Abetted "The Person
               Who Committed" the Egged Bus Bombing .............................. 29

CONCLUSION ............................................................................................. 33

## TABLE OF AUTHORITIES

**Cases**                                             **Page(s)**

*Almog v. Arab Bank, PLC*,
    471 F. Supp. 2d 257 (E.D.N.Y. 2007) ...................................................................19

*Anderson News, L.L.C. v. American Media, Inc.*,
    680 F.3d 162 (2d. Cir. 2012)...........................................................................13

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d. Cir. 2010)...........................................................................14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................13

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d. Cir. 1990).............................................................................6

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    171 F. 3d 779 (2d. Cir. 1999)...........................................................................6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................13

*Boim v. Holy Land Found. For Relief & Dev.* (*Boim III*),
    549 F. 3d 685 (7th Cir. 2008) (en banc) ...........................................17, 18, 19, 20, 23

*Campanella v. County of Monroe*,
    853 F. Supp. 2d 364 (W.D.N.Y. 2012) .............................................................14

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014).........................................................................................5

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d. Cir. 2013)...............................................................................6

*Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*,
    282 F.3d 83 (2d. Cir. 2002)..............................................................................14

*Ehrenfeld v. Mahfouz*,
    489 F.3d 542 (2d. Cir. 2007)............................................................................11

*Gill v. Arab Bank, PLC* (*Gill I*),
    891 F. Supp. 2d 335 (E.D.N.Y. 2012) ......................................................21, 23, 28

*Gill v. Arab Bank, PLC* (*Gill III*),
    893 F. Supp. 2d 542 (E.D.N.Y. 2012) ...............................................21, 27, 28, 29

*Goldberg v. UBS AG*,
 660 F. Supp. 2d 410 (E.D.N.Y. 2009) ...........................................................................17, 20

*Gucci Am., Inc. v. Weixing Li*,
 135 F. Supp. 3d 87 (S.D.N.Y. 2015)......................................................................................12

*Halberstam v. Welch*,
 705 F.2d 472 (D.C. Cir. 1983) ..................................................................................... *passim*

*Holder v. Humanitarian Law Project*,
 561 U.S. 1 (2010)....................................................................................................................23

*Holmes v. Sec. Investor Prot. Corp.*,
 503 U.S. 258 (1991).................................................................................................................16

*Hydro Investors, Inc. v. Trafalgar Power Inc.*,
 227 F.3d 8 (2d. Cir. 2000)......................................................................................................20

*Int'l Shoe Co. v. Wash.*,
 326 U.S. 310 (1945).................................................................................................................12

*Krishanthi v. Rajaratnam*,
 09-CV-5395, 2014 WL 4677175 (D.N.J. Sept. 19, 2014) ....................................................11

*Lerner v. Fleet Bank, N.A.*,
 318 F.3d 113 (2d. Cir. 2003)...................................................................................................20

*Licci v. Lebanese Canadian Bank, SAL (Licci III)*,
 20 N.Y.3d 327 (2012) ........................................................................................................7, 8, 9

*Licci v. Lebanese Canadian Bank, SAL (Licci IV)*,
 732 F.3d 161 (2d. Cir. 2013)........................................................................................ *passim*

*Linde v. Arab Bank*, PLC (*Linde I*),
 384 F. Supp. 571, 588 (E.D.N.Y. 2005) ...................................................................... *passim*

*Linde v. Arab Bank, PLC (Linde II)*,
 882 F. 3d 314 (2d. Cir. 2017)....................................................................................... *passim*

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
 84 F.3d 560 (2d. Cir. 1996).....................................................................................................13

*Porina v. Marward Shipping Co.*,
 521 F.3d 122 (2d. Cir. 2007).....................................................................................................6

*Rothstein v. UBS AG*,
 708 F.3d 82 (2d.Cir. 2013)................................................................................................21, 22

*Selevan v. N.Y. Thruway Auth.*,
    584 F.3d 82 (2d. Cir. 2009).................................................................13

*Shatsky v. Palestine Liberation Org.*,
    1:02-CV-2280, 2017 WL 2666111 (D.D.C. June 20, 2017)................................................9, 10

*Solé Resort v. Allure Resorts Mgmt.*,
    450 F.3d 100 (2d. Cir. 2006)................................................................7

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d. Cir. 2018)................................................................10

*Stansell v. BGP, Inc.*,
    2011 U.S. Dist. LEXIS 39808 (M.D. Fla. Mar. 31, 2011).....................................17

*Strauss v. Credit Lyonnais, S.A.* (*Strauss I*),
    06-CV-0702, 2006 U. S. Dist. LEXIS 72649 (E.D.N.Y. Oct. 5, 2006)................................20

*Strauss v. Credit Lyonnais, S.A.* (*Strauss II*),
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) ................................................................17

*Strauss v. Crédit Lyonnais, S.A.* (*Strauss III*),
    175 F. Supp. 3d 3 (E.D.N.Y. 2016) ................................................................5, 8

*Stutts v. De Dietrich Group*,
    03-CV-4058 (ILG), 2006 U.S. Dist. LEXIS 47638 (E.D.N.Y. June 30, 2006).....................17

*In re Terrorist Attacks on September 11, 2001* (*Al Rajhi Bank*),
    714 F.3d 118 (2d. Cir. 2012).................................................................16, 21, 22

*In re Terrorist Attacks on September 11, 2001*,
    295 F. Supp. 3d 416 (S.D.N.Y. 2018).................................................................10

*Weiss v. Nat'l Westminster Bank PLC* (*Weiss I*),
    453 F. Supp.2d 609 (E.D.N.Y. 2006) ................................................................ *passim*

*Weiss v. Nat'l Westminster Bank PLC* (*Weiss II*),
    176 F. Supp. 3d 264 (E.D.N.Y. 2016) ................................................................5, 6, 8, 11, 12

*Weiss v. Nat'l Westminster Bank PLC* (*Weiss III*),
    278 F. Supp. 3d 636 (E.D.N.Y. 2017) ................................................................ *passim*

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) ................................................................11

## Statutes

1 U.S.C. § 1................................................................26

18 U.S.C. § 2331 ...............................................................................................15, 16, 18, 24

18 U.S.C. § 2333 ................................................................................................... *passim*

18 U.S.C. § 2334 .................................................................................................................11

18 U.S.C. § 2339A ......................................................................................................14, 15

18 U.S.C. § 2339B ..................................................................................................14, 15, 20

18 U.S.C. § 2339C ..................................................................................................14, 15, 21

Justice Against Terrorism Act
    Pub. L. No. 144-22, 130 Stat. 854 (Sept. 28, 2016)....................................... *passim*

**Other Authorities**

CPLR § 302(a)(1) ..........................................................................................6, 8, 9, 10, 12

Fed. R. Civ. P.
    4(k)(1)(A)............................................................................................................................6
    4(k)(1)(C)..........................................................................................................................11
    9(b)....................................................................................................................................14
    12(b)(2) ...............................................................................................................................1
    12(b)(6) .........................................................................................................................1, 13

S. Rep. No. 102-342 (1992) .............................................................................................24

## PRELIMINARY STATEMENT

Plaintiffs Sholom Goldstein, Rabbi Simcha Goldstein, Sarah Breina Goldstein, Shaina Kutten, Shimon Goldstein, Yechezkal Shraga Goldstein, Avrohom David Goldstein, Hendel Lezer, Dovy Goldstein, Chaya Chana Hoffman, Yaakov Yosef Goldstein, Bas-Sheva Goldstein, Moishe Goldstein, Perla Goldstein, Toby Goldstein and Yisroel Yehuda Goldstein ("Plaintiffs"), respectfully submit this Memorandum of Law in opposition to defendant Arab Bank, PLC's ("Arab Bank" or the "Bank") Motion to Dismiss the First Amended Complaint (the "FAC") (Mateyaschuk Decl., Ex. 1).

This action is brought by direct and indirect American victims of one of the deadliest suicide bombings perpetrated by HAMAS in Israel during the Second Intifada. Plaintiffs have asserted claims against Arab Bank under the civil liability provisions of the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333, alleging that the Bank is: (i) primarily liable, pursuant to § 2333(a), having proximately caused plaintiffs' injuries through its knowing provision of material support to HAMAS and its agents (Counts I-III); and (ii) secondarily liable, pursuant to § 2333(d), for conspiring with, and aiding and abetting, HAMAS in furtherance of its terrorist objectives during the Second Intifada (Counts IV and V).

Defendant has moved to dismiss this action in its entirety under Fed. R. Civ. Pro. 12(b)(2) and 12(b)(6), arguing that this Court lacks personal jurisdiction over the Bank and that the FAC does not sufficiently allege violation of the ATA.  Defendant's arguments are without merit, are based on inapplicable case law and/or incorrect interpretations of the applicable case law and are reliant on factual assertions that are improper for a motion to dismiss.

Of particular note, defendant misstates the applicable standards under the ATA as plaintiffs need not demonstrate that the Bank's conduct constituted an act of "international

terrorism" in order to sustain their conspiracy and aiding and abetting claims under the recently enacted § 2333(d).  *Linde v. Arab Bank, PLC (Linde II)*, 882 F. 3d 314, 328 (2d. Cir. 2017).

The allegations of the FAC clearly establish a cause of action under the ATA.  Plaintiffs have alleged that the Bank materially supported HAMAS, given HAMAS' known pervasive control of the Saudi Committee and other "charitable" fronts.  The Saudi Committee has been established to be an agent of HAMAS, and the Bank's purposeful provision of aid to this and other known HAMAS agents constitutes <u>direct</u> material support to HAMAS under ATA.

Defendant's argument that this Court does not have personal jurisdiction is similarly unavailing in that the FAC clearly alleges that the Bank used its New York branch as an instrument through which to fund, incentivize and effectuate HAMAS' sustained reign of terror during the Second Intifada.

For these reasons defendant's Motion to Dismiss should be denied in its entirety.

## FACTUAL ALLEGATIONS IN THE FIRST AMENDED COMPLAINT[1]

Defendant Arab Bank is a Jordanian financial institution that was founded in 1930 by the Shoman family, members of which maintained key roles in its management at all relevant times. (FAC at ¶¶ 41-42). Although headquartered in Jordan, the Bank has long maintained a physical presence in the United States in the form of a wholly-owned branch office in New York ("ABNY") (*Id.* at ¶¶ 41, 44).

HAMAS is a radical terrorist organization that was founded during the First Intifada, in December 1987, and subsequently designated as a Foreign Terrorist Organization ("FTO") by the U.S. government in 1997. (FAC at ¶¶ 47, 54). While HAMAS claims to serve a humanitarian purpose, its activities are largely in support of international terrorism. (*Id.* at ¶¶ 50, 53).

---

[1] In the interest of brevity only a very brief summary of the facts is presented herein.  For a more complete recitation of the facts the Court is referred to the FAC.

The FAC alleges specific facts demonstrating that Arab Bank was a willing accomplice in HAMAS' sustained terror campaign during the Second Intifada, having knowingly conspired to provide HAMAS with the modernized banking services and wherewithal necessary to efficiently convert and transfer donations received by its agents, while circumventing banking regulations and anti-terrorism laws. (FAC at ¶¶ 75-78). Defendant's decision to support HAMAS in this fashion was directly linked to the Bank's founders, who long harbored anti-Zionist views in line with HAMAS and were reputed leaders of the Intifada movement in Palestine. (*Id.*). The Bank is also alleged to have directly participated in the creation of the Saudi Committee in Support of the Intifada Al Quds (the "Saudi Committee" or "Committee"), a fundraising apparatus created to bankroll HAMAS and its other front organizations, and to support the families of HAMAS "martyrs." (FAC at ¶¶ 79-82).

On August 19, 2003, Palestinian suicide bomber Ra'ed Abd al-Hamid Misk ("Misk") boarded the No. 2 Egged bus in Jerusalem, Israel and detonated an explosive device packed with ball bearings (the "Egged Bus Bombing"). (FAC at ¶ 60). The attack killed 20 people, and injured another 140, including plaintiff and U.S. citizen Sholom Goldstein. (*Id.* at ¶ 63).

As detailed in the FAC, Misk was an operative of HAMAS, which purposefully orchestrated, funded and carried out the Egged Bus Bombing. (FAC at ¶¶ 67, 120).  Among those assisting Misk in connection with the Egged Bus Bombing were Ahmed Bader ("Bader"), the head of HAMAS' military wing in Hebron at the time, and Shafiq Abd al-Qader al-Qawasmeh ("Qawasmeh"), a senior HAMAS commander.  (FAC at ¶¶ 73-74, 120).  There were also four other accomplices who were ultimately detained and convicted in connection with the Egged Bus Bombing (the "Convicted HAMAS Operatives") (*Id.* at ¶ 73).

The FAC alleges that the Egged Bus Bombing was funded by one or more ABNY transfers to Bader (the "Alleged Bader Transfer(s)"), who then utilized said monies, either alone or together with monies from separate transfers effectuated to other HAMAS leaders, to whom ABNY facilitated dozens of transfers from 2000-2002, totaling nearly $600,000 (the "HAMAS Leadership Transfers"). (*Id.* at ¶¶ 117, 120).

The Bank knew at all relevant times that these transferees, for whom the Bank also maintained personal accounts, were affiliated with HAMAS. (FAC at ¶¶ 57, 116, 121). The Bank's knowing intent to fund HAMAS is best illustrated by its interactions with Hamdan, a HAMAS leader for whom the Bank maintained an account, and effectuated transfers, from 1998 to 2004 – even after his designation as a terrorist in 2003. (*Id.* at ¶ 118). Perhaps most striking is that the Bank "failed" to detect or stop two Hamdan transfers in 2000 which were expressly made payable to "HAMAS" or "HAMAS ORGANIZATION" (the Hamdan Transfers).[2] (*Id.*).

The Hamdan Transfers were merely a fraction of the more than $32,000,000 in transfers that Arab Bank facilitated to HAMAS through its various "charitable" front organizations during the relevant time period (the "HAMAS Alter Ego Transfers"). (*Id.* at ¶ 129).  Said total includes at least $15,000,000 in payments issued by the Saudi Committee, including transfers effectuated by the Bank in connection with its exclusive administration of the Committee's  "universal death and dismemberment program" (the "Martyr Insurance Program") (*Id.* at ¶¶ 80-86, 129). Transfers of this nature are alleged to have been effectuated by the Bank and ABNY to the

---

[2]      Defendant repeatedly insists that the Bank is free of any knowing misconduct in that ABNY's electronic funds transfers were fully automated, <u>without any manual intervention</u>. (Def's Br. at p. 5). But the FAC fundamentally disputes this notion. *See, e.g.*, (FAC at ¶ 46) (OCC Consent Order and FinCEN Joint Release "determined that [ABNY] failed to implement an adequate anti-money laundering program to . . . manage the risks of money laundering and terrorist financing in connection with United State dollar clearing transactions."); (*Id.* at ¶¶ 118-119) (alleging that the Bank maintained accounts, and processed transactions totaling more than $2,500,000 for eleven individuals or organizations that were formally designated as terrorists); (*Id.* at ¶ 130) (alleging manual intervention from ABNY employees in connection with U.S. dollar clearing transactions to HAMAS alter egos).

beneficiaries of Misk, Shafiq and the Convicted HAMAS Operatives – each of whom are alleged to have fallen within the coverage of the "Martyr Insurance Program" – in connection with the Egged Bus Bombing (the "Alleged Egged Bombing Insurance Payments"). (*Id.* at ¶¶ 87-89, 129). These Alleged Egged Bombing Insurance Payments are separate and apart from the documented transfers that the Bank initiated and/or facilitated to Qawasmeh (the "Qawasmeh Transfer") and Misk (the "Misk Transfer") in 2000 and 2004, respectively. (*Id.* at ¶¶ 108, 112).

The foregoing allegations demonstrate that: (i) the Bank knowingly and intentionally provided material support to HAMAS and its agents during the Second Intifada; (ii) this support bears a direct causal relationship to the Egged Bus Bombing; and (iii) absent the Bank's provision of such financial and administrative services, HAMAS would not have been able to sustain the Second Intifada. (FAC at ¶¶ 5, 104, 111, 115, 121, 128, 136, 152, 161).

## LEGAL ARGUMENT

## I.    THIS COURT HAS PERSONAL JURISDICTION OVER ARAB BANK

In its Motion to Dismiss, Arab Bank relies on the inapplicable holding in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), which relates to general, not specific, jurisdiction, and attempts to distinguish *Licci v. Lebanese Canadian Bank, SAL* (*Licci IV*), 732 F.3d 161 (2d. Cir. 2013) through a misleading summary of its operative facts.[3]  The Second Circuit's finding of specific jurisdiction in *Licci* is simply inescapable.

Indeed, the nature of Arab Bank's conduct in New York provides even stronger grounds to impose specific jurisdiction than were present in *Licci*.  *See Weiss v. Nat'l Westminster Bank PLC* (*Weiss II*), 176 F. Supp. 3d 264, 279, 287 (E.D.N.Y. 2016); *Strauss v. Crédit Lyonnais, S.A.* (*Strauss III*), 175 F. Supp. 3d 3, 19, 30 (E.D.N.Y. 2016).

---

[3]        As defense counsel is well aware – having also represented the defendant bank in *Licci IV* - the allegations of the FAC mirror those set forth by the *Licci* plaintiffs. *See Licci IV*, 732 F.3d at 165-166.

### A. Applicable Legal Standard on Motion to Dismiss for Lack of Personal Jurisdiction

When faced with a challenge to personal jurisdiction, "the plaintiff[s] bear[] the burden of establishing that the court has jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F. 3d 779, 784 (2d. Cir. 1999) (citation omitted). "The plaintiff[s] need only make a *prima facie* showing that jurisdiction exists to satisfy that burden." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d. Cir. 2013) (emphasis in original).

In assessing whether this *prima facie* burden has been satisfied, the Court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d. Cir. 2007). In pre-discovery jurisdictional challenges, "the plaintiff[s'] *prima facie* showing may be established solely by [legally sufficient] allegations." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d. Cir. 1990) (emphasis in original).

Where, as here, there is no dispute that defendant was properly served with process,[4] "the Court's analysis primarily is a two-part inquiry to determine whether there is a statutory basis for jurisdiction, and, if so, whether due process is satisfied." *Weiss II*, 176 F. Supp. 3d at 276.

### B. New York's Long-Arm Statute Authorizes this Court to Exercise Specific Jurisdiction Over Arab Bank

Fed. R. Civ. P. 4(k)(1)(A) authorizes federal courts to "exercise personal jurisdiction to the extent of the applicable [State] statutes." *Id.* at 278 (citations omitted). Therefore, under Rule 4(k)(1)(A), New York's long-arm statute must be analyzed to determine if jurisdiction exists. *Id.*

Under New York's statute, CPLR § 302(a)(1), "two requirements must be met: (1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise

---

[4]     Arab Bank has not raised the issue of improper service and has therefore waived any such challenge. *Weiss II*, 176 F. Supp. 3d at n.10.

from that business activity." *Solé Resort v. Allure Resorts Mgmt.*, 450 F.3d 100, 103 (2d. Cir. 2006) (citation omitted).

With regard to the first prong, known as "purposeful availment," the Bank misstates plaintiffs' position in arguing that the FAC relies only on the Misk and Qawasmeh Transfers. (Def's Br. at pp. 10-11).  In fact, the FAC alleges that the Misk and Qawasmeh Transfers merely constitute the only transfers now known, without discovery, to have been initiated and/or processed by Arab Bank to presently identifiable participants in the Egged Bus Bombing.

While those two transfers are currently proven, the FAC alleges, upon information and belief, several additional categories of transfers, including the Alleged Bader Transfer(s) (FAC at ¶¶ 44, 73, 120, 122), the Alleged Egged Bombing Insurance Payments (FAC at ¶¶ 44, 73-74, 87-88 122), the Hamdan Transfers (FAC at ¶¶ 118-122) and the HAMAS Leadership Transfers (FAC at ¶¶ 116-117, 120-122). As such, the FAC alleges dozens of known and/or plausibly alleged transfers that were routed through ABNY for conversion into U.S. dollars in furtherance of the Second Intifada for the knowing purpose of bankrolling HAMAS' terrorist objectives, including but not limited to the Egged Bus Bombing. Plausibly pleaded allegations of this nature are sufficient to demonstrate purposeful availment on the part of Arab Bank.

After all, it is well-established under New York law that:

> complaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client - - in effect, a "course of dealing" - - shows purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States.

*Licci v. Lebanese Canadian Bank, SAL (Licci III)*, 20 N.Y.3d 327, 339 (2012).

Utilizing this very guidance from the New York Court of Appeals, the *Licci IV* Court determined that a defendant foreign bank ("LCB") had purposefully availed itself of the privilege

of doing business in New York by wiring millions of dollars to a foundation allegedly associated with Hizballah using a correspondent bank account LCB maintained at American Express. *Licci IV*, 732 F.3d at 165-166, 171 (citation and internal quotation omitted).

In this action, as was the case with regard to the defendant in *Licci IV*, Arab Bank <u>chose</u> to avail itself of New York's banking system – opting to clear all of its worldwide branches' U.S. dollar transactions through ABNY from 1982 to approximately February 2005.  (FAC at ¶ 44). Its conduct in doing so was not "random, isolated, or fortuitous" – but, instead, constituted deliberate and recurring activity alleged by plaintiffs to have been relied upon by HAMAS to fund, incentivize and effectuate its terrorist objectives during the Second Intifada, including the Egged Bus Bombing. (FAC at ¶¶ 44, 87-89, 95-97, 103, 107-109, 112-113, 116-129).

What's more, "[w]hereas the bank in *Licci* maintained only a correspondent account as its sole point of contact in New York, Defendant had a New York Branch." *Weiss II*, 176 F. Supp. 3d at 279; *Strauss III*, 175 F. Supp. 3d at 19.  As such, Arab Bank's "relevant New York conduct is even more substantial and sustained than that of the foreign bank in the *Licci* cases . . .." *Weiss II*, 176 F. Supp. 3d at 279; *Strauss III*, 175 F. Supp. 3d at 19.  Clearly, the FAC alleges that Arab Bank "transacted business within the state" as construed under New York's long-arm statute.

The second requirement of CPLR § 302(a)(1), which is traditionally referred to as the "nexus" prong, "does not require a causal link between the defendant's New York business activity and a plaintiff's injury[,]" but rather necessitates "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." *Licci IV*, 732 F.3d at 168-169 (citing *Licci III*, 20 N.Y.3d at 339) (internal quotations omitted). Such is the case here, as made clear in *Licci III*.

There, the Court of Appeals held that "[b]ecause the defendant's allegedly culpable conduct stem[med] from [its] use of the New York correspondent account, . . . the plaintiffs' claims [we]re sufficiently related to LCB's New York business activity to satisfy the second prong of section 302(a)(1)." *Id.* at 169 (citing *Licci III*, 20 N.Y.3d at 340). A similar result should follow here, as each and every one of plaintiffs' causes of action against defendant is invariably grounded in the notion that the Bank violated the ATA by using its New York branch as an instrument through which to fund, incentivize and effectuate its shared terrorist objectives with HAMAS during the Second Intifada, including the Egged Bus Bombing. (FAC ¶¶ 44, 87-89, 95-96, 103, 107-109, 112-113, 116-129, 134-162).

Defendant argues that the FAC fails to plausibly allege a "substantial relationship" between plaintiffs' injuries, on the one hand, and the Misk and Qawasmeh Transfers, on the other hand, claiming that the payments "are too remote in time from the Bus No. 2 Attack to support the exercise of specific jurisdiction in this case." (Def's Br. at pp. 10-11). Here again defendant misstates that applicable standard. Plaintiffs' need not establish a causal link between the Bank's New York banking activities and plaintiff's injuries to establish jurisdiction, but must only demonstrate a nexus between ABNY's in-state conduct and the elements of the various causes of action pleaded.[5] *Licci IV*, 732 F.3d at 169.

Furthermore, the FAC alleges numerous subsets of ABNY transfers – namely, the Alleged Bader Transfer(s) and the Alleged Egged Bombing Insurance Payments[6] – that establish direct causal ties to the Egged Bus Bombing, yet remain virtually unaddressed by defendant.

---

[5]     Notably, Section 302(a)(1) "does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute." *Licci IV*, 732 F.3d at 169 (quoting *Licci III*, 20 N.Y.3d at 341).

[6]     Defendant cites to *Shatsky v. Palestine Liberation Org.*, 1:02-CV-2280, 2017 WL 2666111, at *10 (D.D.C. June 20, 2017) arguing that "payments to 'martyr' families post-dating a terrorist attack cannot have caused that

9

Defendant's arguments regarding the HAMAS Leadership Transfers[7] and the Hamdan Transfers are similarly unavailing. (Def's Br. at p. 11). The FAC expressly alleges that: (i) the Egged Bus Bombing was funded either through the Alleged Bader Transfer(s) alone "or together with monies from separate transfers to other leaders of HAMAS and the Qassam Brigades (such as the [HAMAS Leadership Transfers and/or the Hamdan Transfers]) . . .." (FAC at ¶ 120); (ii) said funding was received in U.S. dollars from the Saudi Committee and/or other "charitable" front organizations, which were merely alter egos of HAMAS, after being cleared by ABNY (FAC at ¶¶ 44, 51-52, 106-107, 122-124); and (iii) Arab Bank was aware of the HAMAS affiliations of the transferors and recipients of the HAMAS Leadership Transfers and Hamdan Transfers at all relevant times, but cleared these "substantial and material monetary transfers" through ABNY with the knowing intent to further HAMAS' terrorist objectives, including the Egged Bus Bombing. (FAC at ¶¶ 51-52, 116, 121).

These allegations, when viewed in a light most favorable to plaintiffs, are also independently sufficient to plausibly establish the requisite relatedness required under the nexus prong between the HAMAS Leadership and Hamdan Transfers and plaintiffs' causes of action.[8]

---

attack." (Def's Br. at p. 11). But the *Shatsky* Court merely concluded – on a summary judgment standard – that post-attack payments to beneficiaries of alleged terrorist operatives could not have proximately caused plaintiffs' injuries because there was no evidence linking the supposed operatives to the bombing itself. *Shatsky*, 2017 WL 2666111 at *31-32. What's more, Shatsky does nothing to change the fact that plaintiffs' allegations regarding the illicit Martyr Insurance Program can invariably form the basis of their secondary liability claims, which do not require a showing of causation. *See Linde I*, 384 F. Supp. 2d at 583-585.

[7]     Defendant references the unrelated 2002 Park Hotel bombing that HAMAS leader Abbas al Sayad helped orchestrate to support its contention that none of the HAMAS Leadership Transfers can satisfy the nexus prong of CPLR § 302(a)(1). (Def's Br. at pp. 11-12). This position is unavailing. Indeed, the FAC refers to Sayad only to further support its allegations that the monies used to fund HAMAS' attacks during the Second Intifada came from transfers effectuated through ABNY, including the Alleged Bader Transfer(s) and the HAMAS Leadership Transfers that were used to fund the Egged Bus Bombing. (FAC at ¶ 44, 120, 122).

[8]     The cases relied upon by defendant in support of its meritless personal jurisdiction contentions are clearly distinguishable and/or inapposite: *In re Terrorist Attacks on September 11, 2001*, 295 F. Supp. 3d 416 (S.D.N.Y. 2018) (dismissing ATA claims against defendant banks with no physical New York presence, based upon precedent expressly distinguished from the present circumstances by the *Licci IV* Court [732 F.3d at 173]); *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d. Cir. 2018) (affirming dismissal of non-ATA action for lack of personal jurisdiction over

Accordingly, plaintiffs have clearly demonstrated the presence of personal jurisdiction under New York law.

### C. Fed. R. Civ. P. 4(k)(1)(C) Provides an Additional Statutory Basis for this Court to Exercise Personal Jurisdiction Over Defendant

Fed. R. Civ. P. 4(k)(1)(C) provides an additional statutory basis for the exercise of personal jurisdiction over Arab Bank in this action. Specifically, "[u]nder Rule 4(k)(1)(C), personal jurisdiction may be established through proper service of process upon a defendant pursuant to a federal statute that contains its own service provision." *Weiss II*, 176 F. Supp. 3d at 283 (citations omitted). The ATA is such a statute in that it "expressly authorizes nationwide service of process, thereby establishing personal jurisdiction over a defendant properly served under the statute" *Id.* at 284 (citing, *inter alia*, 18 U.S.C. § 2334) (providing for nationwide service of process "where[ever] the defendant resides, is found, or has an agent").

Given that Arab Bank was properly served with process in New York, (*see*, *supra*, n. 4), Rule 4(k)(1)(C) provides another statutory basis upon which this Court may exercise personal jurisdiction. *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 32 (D.D.C. 2010) (emphasis in original).

### D. The Exercise of Personal Jurisdiction Over Arab Bank Will Not Offend Traditional Notions of Fair Play and Substantial Justice

Having established that there are two independent statutory bases authorizing this Court to exercise personal jurisdiction over Arab Bank, the Court must next determine whether such an exercise of jurisdiction would comport with due process. *Id.*; *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d. Cir. 2007).

---

defendants that, again, "lack[ed] any presence in New York at all[,]"); and *Krishanthi v. Rajaratnam*, 09-CV-5395, 2014 WL 4677175 (D.N.J. Sept. 19, 2014) (dismissing ATA claims against foreign bank with New Jersey presence for lack of personal jurisdiction, determining that plaintiffs could not satisfy the inapposite "but for" causation test employed by Third Circuit in connection with its analysis of specific jurisdiction).

Due process requires that the defendant "have certain minimum contacts [with the forum state] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Licci IV*, 732 F.3d at 169 (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (alterations in original). In the event this "threshold showing of 'minimum contacts' is satisfied, the Court must also consider whether its exercise of jurisdiction would be reasonable under the circumstances." *Weiss II*, 176 F. Supp. 3d at 284.

The Second Circuit has acknowledged that "it would be 'rare' and 'unusual' for a court to determine that the exercise of personal jurisdiction over a defendant was permitted by § 302(a)(1), but prohibited under principles of due process." *Id.* (quoting *Licci IV*, 732 F.3d at 170) ("Indeed, we have been pointed to no such decisions in this Circuit."). In light of the fact that § 302(a)(1) authorizes the exercise of specific jurisdiction over Arab Bank, "it would be unusual, and even unprecedented, for the Court to find that due process is not satisfied here." *Weiss II*, 176 F. Supp. 3d at 285.

Minimum contacts sufficient to satisfy the requirements of due process are deemed to "exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci IV*, 732 F.3d at 170 (citation omitted).  The analysis of such contacts mirrors that for satisfying New York's long-arm jurisdiction requirements. *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 97 (S.D.N.Y. 2015) (citations omitted).

Accordingly, for the reasons discussed *supra*, the allegations of the FAC satisfy the minimum contacts component of the due process inquiry. *See Licci IV*, 732 F.3d at 171-172 ("It should hardly be unforeseeable to a bank that selects and makes use of a particular forum's

banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use.").

Furthermore, Arab Bank has not demonstrated the requisite, "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Licci IV*, 732 F.3d at 173-174 (citing, *inter alia*, *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 575 (2d. Cir. 1996)) (instructing that "dismissals resulting from the application of the reasonableness test should be few and far between."). Therefore, this Court may exercise personal jurisdiction over Arab Bank without offending due process.

## II.   THE FIRST AMENDED COMPLAINT SHOULD NOT BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A.  The Applicable Legal Standards on a Rule 12(b)(6) Motion to Dismiss

The standards for a Rule 12(b)(6) motion are well established, as set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which hold that a motion should be denied, where, as here, the allegations of the subject pleading contain "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. In assessing plausibility, "the court is required to proceed 'on the assumption that all the [factual] allegations in the complaint are true[,]' [e]ven if their truth seems doubtful." *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 185 (2d. Cir. 2012) (quoting *Twombly*, 550 U.S. at 555) (emphasis in *Anderson News*). The applicable standard is plausibility, not probability, and, as such, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of th[e] facts [alleged] is improbable…." *Twombly*, 550 U.S. at 555 (citation and internal quotation omitted).

The Court must "construe plaintiffs' complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiffs' favor." *Selevan v.*

*N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d. Cir. 2009) (citation omitted). This includes facts alleged on information and belief when said facts are "peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d. Cir. 2010) (internal and external citations omitted).

Specific evidence of a defendant's mental state (*e.g.*, intent, motive and/or knowledge) is rarely available to plaintiffs at the pre-discovery stage, and thus need not be pleaded with full specificity. *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d. Cir. 2002) ("It is sufficient to allege facts from which [the pertinent] intent on the part of the defendants reasonably may be inferred.") (citations omitted); *Campanella v. County of Monroe*, 853 F. Supp. 2d 364, 374 (W.D.N.Y. 2012) ("The question at th[e] [motion to dismiss stage] is whether plaintiffs have alleged sufficient facts to make such a claim *plausible*.") (citations omitted) (emphasis in original).

### B.  Plaintiffs Have Sufficiently Pled their Primary Liability Claims (Counts I – III)

Plaintiffs' FAC asserts three independent primary liability claims against defendants under § 2333(a) of the ATA, which affords civil remedies to victims of terrorism, providing that:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a) (emphasis added).  These claims are premised upon defendant's alleged violation of three distinct criminal statutes – 18 U.S.C. §§ 2339A, 2339B and 2339C (collectively, the "Material Support Statute") – which function as the predicate acts of "international terrorism" underlying plaintiffs' primary liability claims.

Collectively, the Material Support Statutes make it unlawful to: (1) "provide material support or resources" to terrorists "knowing or intending that they are to be used in preparation for, or in carrying out," terrorist attacks (§ 2339A); (2) "provide[] material support or resources to a foreign terrorist organization" with "knowledge that the organization is a designated terrorists organization . . . that the organization has engaged or engages in terrorist activity . . . or that the organization has engaged or engages in terrorism" (§ 2339B); and (3) "unlawfully and willfully provide or collect funds with the intention that such funds be used, or with the knowledge that such funds are to be used . . . to carry out [an act] intended to cause death or serious bodily injury to a civilian, . . . when the purpose of that act, by its nature or context, is to intimidate a population, or to compel a government . . . to do or to abstain from doing any act" (§ 2339C).

Arab Bank does not meaningfully contest the fact that the allegations of the FAC are sufficient to plausibly demonstrate defendant's violation of the Material Support Statutes (particularly §§ 2339A and B). Instead, the Bank suggests that its plausibly-alleged violations of these Material Support Statutes[9] are only capable of satisfying *part* of the statutory definition of "international terrorism" set forth in § 2331(1) – namely, the requirements that the Bank's actions: (i) violate "the criminal laws of the United States" and (ii) "transcend national boundaries in terms of the means by which they are accomplished" §§ 2331(1)(A) and (C).

Defendant specifically contends that "commercial banking services" are fundamentally incapable, as a matter of law, of satisfying the remaining statutory components of "international terrorism" – specifically, the requirements that the Bank's actions: (iii) "involve acts dangerous to human life" and (iv) "appear to be intended . . . to intimidate or coerce a civilian population"

_____

[9]     Allegations sufficient to establish plausible violations of §§ 2339A, 2339B and 2339C can be found in the FAC at ¶¶ 1, 4-5, 41-42, 44-46, 48-56, 58, 60, 63-69, 73-97, 100-130, 134-137, 139, 142, 145.

or "to influence the policy of a government by intimidation or coercion." (§§ 2331(1)(A) and
(B); *see* Def's Br. at p. 14).  Moreover, the Bank insists that in order for other "forms of material
support [to] qualify as 'acts of international terrorism,' they must be "truly exceptional" in
nature" such that it would be akin to "a person who voluntarily acts as a suicide bomber for
Hamas in Israel." (Def's Br. at pp.14-15).

Defendant's position ignores the appropriate relevant precedent which holds that where,
as here, a defendant bank is plausibly alleged to have provided financial services to HAMAS
*with knowledge that it was assisting in the funding of terrorist activities*, that conduct is capable
of constituting both a violation of the Material Support Statutes and an act of "international
terrorism." *Linde II*, 882 F. 3d at 326. *See also*, *Weiss v. Nat'l Westminster Bank PLC* (*Weiss
III*), 278 F. Supp. 3d 636, 641-642 (E.D.N.Y. 2017) (finding that the 2006 ruling in *Weiss I*
"stands" in this District); *Weiss v. Nat'l Westminster Bank PLC* (*Weiss I*), 453 F. Supp.2d 609,
625 (E.D.N.Y. 2006) (determining that the provision of "basic banking services" can constitute
material support and give rise to ATA liability "[w]here 'the Bank knows that the groups to
which it provides services are engaged in terrorist activities.'") (quoting *Linde v. Arab Bank*,
*PLC* (*Linde I*), 384 F. Supp. 2d 571, 588 (E.D.N.Y. 2005)).

Defendant similarly (and deceptively)[10] misstates the law with regard to the causation
necessary to sustain plaintiffs' primary liability claims – insisting, without any meaningful
authority, that the ATA affirmatively imposes a "but for" causation requirement on plaintiffs.
(Def's Br. at p. 16). The Bank undoubtedly recognizes that allegations virtually identical to those

---

[10]     Recognizing the lack of authority for its proposition that the ATA imposes a "but for" causation
requirement, the Bank attempts to pass off a parenthetical quote from *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S.
258, 268 (1991), which explained a plaintiff's pleading obligation under the Clayton Act, as the ultimate holding
from *In re Terrorist Attacks on September 11, 2001* (*Al Rajhi Bank*), 714 F.3d 118, 123 (2d. Cir. 2012). (*See* Def's
Br. at p. 16). Put simply, *Al  Rajhi Bank* does not stand for such a proposition.

of the FAC have repeatedly withstood attack on proximate causation in this District at both the

motion to dismiss and summary judgment stages. *See, e.g.*, *Weiss III*, 453 F. Supp. 2d at 622-

632; *Weiss I*, 278 F. Supp. at 641-644; *Linde I*, 384 F. Supp. 2d at 587-588.  Defendant's attempt

to effectively abrogate the uniform body of federal law governing ATA causation should not be

accepted. *See, e.g.*, *Strauss v. Credit Lyonnais, S.A.* (*Strauss II*), 925 F. Supp. 2d 414, 432-434

(E.D.N.Y. 2013); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429-430 (E.D.N.Y. 2009); *Weiss I*,

453 F. Supp. 2d at 631-632.  *See also*, *Stansell v. BGP, Inc.*, 2011 U.S. Dist. LEXIS 39808, *27-

28, n. 5 (M.D. Fla. Mar. 31, 2011) ("Defendants have suggested that the Court adopt a 'but for'

causation requirement. However the Court is unaware of, and Defendants fail to point to, any

ATA case in which such strict causation is required. In fact, many courts considering the ATA

have definitively held that but for causation is not required." (citations omitted).

### 1. Plaintiffs Plausibly Allege that the Bank Committed "An Act of International Terrorism"

In support of its contention that "commercial banking services" are patently incapable, as

a matter of law, of constituting acts of "international terrorism", defendant relies primarily on

this Court's decision in *Stutts v. De Dietrich Group*, 03-CV-4058 (ILG), 2006 U.S. Dist. LEXIS

47638, *11 (E.D.N.Y. June 30, 2006).  Defendant's reliance on *Stutts* is misguided and bluntly

ignores more recent precedent relying on the Seventh Circuit's decision in *Boim v. Holy Land

Found. For Relief & Dev.* (*Boim III*), 549 F. 3d 685 (7th Cir. 2008) (en banc).

In *Boim III*, the Seventh Circuit was faced with an issue virtually identical to that

presently before the Court: "whether a jury could find defendants who had [funded] Hamas and

Hamas-affiliated charities, knowing that Hamas used such money to finance the killing of Israeli

Jews, some of whom were American citizens, liable under the ATA . . .." *Linde II*, 882 F.3d at

327 (citing *Boim III*, 549 F. 3d at 690).  It concluded in the affirmative, determining that the

Material Support Statutes could form the basis for primary ATA liability, through a chain of explicit statutory incorporations by reference,[11] provided that plaintiffs could likewise "satisfy the definitional requirements of an act of international terrorism by proving that the conduct violating a material support statute also involved violence or endangered human life and manifested an apparent intent to coerce or intimidate civilians or to influence or affect government." *Linde II*, 882 F.3d at 327 (citing *Boim III*, 549 F. 3d at 690).

The *Boim III* Court pronounced that "[g]iving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life.' And it violates [the Material Support Statutes]." *Id.* at 690.   It likewise observed that:

> A knowing donor to Hamas - - that is, a donor who knew the aims and activities of the organization - - would know that Hamas was gunning for Israelis . . ., that Americans are frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel . . ., and that donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel. And given such foreseeable consequences, such donations would 'appear to be intended . . . to intimidate or coerce a civilian population' or to 'affect the conduct of a government by . . . assassination,' as required by section 2331(1) in order to distinguish terrorist acts from other violent crimes, though it is not a state-of-mind requirement; it is a matter of external appearance rather than subjective intent, which is internal to the intender.

*Id.* at 693-694 (internal citations omitted) (emphasis added).

The Second Circuit has expressly affirmed the position of *Boim III* that "conduct that violates a material support statute can also satisfy the § 2331(1) definitional requirements of international terrorism in some circumstances." *Linde II*, 882 F.3d at 326.  Arab Bank attempts to subvert this ruling by arguing that *Linde II* stands only for the proposition that "the provision of some forms of material support" outside the context of commercial banking "may qualify as 'acts of international terrorism,'" and only then in "truly exceptional" instances "akin to a suicide

---

[11]     Of particular note, the *Boim III* Court indicated that "whether it makes good sense or not, the imposition of civil liability through the chain of incorporations is compelled by the statutory texts . . .." *Boim III*, 549 F.3d at 691.

bombing." (Def's Br. at pp. 14-15). This was not the holding of the Second Circuit in *Linde II*, which made clear that its example of a suicide bomber was merely the "[m]ost obvious[]" of qualifying scenarios. *Linde II*, 882 F.3d at 326.

Notably, in reaching its conclusion, the *Linde II* Court expressly acknowledged that the ultimate determination as to whether or not Arab Bank's provision of financial services to HAMAS should be deemed to constitute "international terrorism" hinges upon whether or not said services are "routine" in nature – an implicit reference to the long line of cases in this District that have found primary ATA liability against Arab Bank and other financial institutions upon determining that "a bank cannot 'routinely' provide banking services, if they provide those services with knowledge of their assistance in funding terrorist activities.'" *Linde I*, 384 F. Supp. 2d at 588; accord *Linde II*, 882 F.3d at 327. *See also*, *Weiss III*, 278 F. Supp. 3d at 641-642; *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 268 (E.D.N.Y. 2007); *Weiss I*, 453 F. Supp.2d at 625. In other words, the Second Circuit recognizes that the mental element required to fix primary ATA liability is present where the provider of financial services "knows the character of that organization." *Boim III*, 549 F.3d at 695; accord *Linde II*, 882 F.3d at 327.

The FAC clearly alleges that the Bank was fully aware of the character of HAMAS and was fully aware that it was acting on behalf of a recognized FTO and other known terrorists. The Bank's founders supported HAMAS' goals, participated in the creation of its Saudi Committee alter ego that was used to finance HAMAS' operations during the Second Intifada, underwrote and administered the Committee's illicit Martyr Insurance Program in conjunction with local HAMAS representatives, and maintained accounts for known and highly publicized HAMAS leaders, who terrorist objectives and activities were well-publicized and well-known throughout the region. *See, e.g.* (FAC at ¶¶ 42, 45-46, 53, 57, 67-69, 75-77, 79-82, 90-91, 95-97,

19

117, 121, 122, 124, 127-128).  It strains credulity for the Bank to claim that it was unaware of either HAMAS' activities or the relationship of the Saudi Committee to HAMAS.

These allegations are more than sufficient to satisfy plaintiffs' pleading obligations and state a claim that Arab Bank is primarily liable under the ATA.

### 2. Plaintiffs Plausibly Allege Proximate Causation for their Primary Liability Claims

The FAC likewise pleads that Arab Bank's provision of extraordinary financial services to HAMAS (whether directly or through its known agents)[12] was "a substantial factor in the sequence of responsible causation" of the Egged Bus Bombing, and "that the injur[ies] [to plaintiffs] w[ere] reasonably foreseeable or anticipated as a natural consequence[]" – that is, that Arab Bank was a proximate cause of the Egged Bus Bombing. *Weiss III*, 453 F. Supp. 2d at 631 (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d. Cir. 2003)). *See also*, *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d. Cir. 2000) ("A proximate cause determination does not require a jury to identify the liable party as the sole cause of the harm; it only asks that the identified cause be a substantial factor in bringing about the injury.").

Defendant disingenuously argues "that the provision of a ***financial service*** to [alleged Hamas members and 'front' charities] – to be distinguished from a donation of funds, which is not plausibly alleged [in the FAC] – " cannot satisfy proximate causation under the ATA. (Def's Br. at p. 18) (emphasis in original).  Defense counsel assuredly knows this is not the case, as

---

[12]    *See Goldberg*, 660 F. Supp. 2d at 432-433 (holding that "a violation of § 2339B may be found where an entity provides money or support to an organization knowing that the ultimate beneficiary is the FTO."); *Boim III*, 549 F.3d at 701-702 ("Donor A gives to innocent-appearing organization B which gives to innocent-appearing organization C which gives to Hamas. As long as A either knows or is reckless in failing to discover that donations to B end up with Hamas, A is liable."); *Strauss v. Credit Lyonnais, S.A.* (*Strauss I*), 06-CV-0702, 2006 U. S. Dist. LEXIS 72649, *34-*37 (E.D.N.Y. Oct. 5, 2006) (determining that allegations concerning the provision of financial services to charities claimed to have been controlled by HAMAS agents was sufficient to state a claim under § 2339B, in that "support provided to these ["charitable"] organizations is support provided to an FTO.").

Judge Weinstein (who defendant quotes in the very next sentence[13]) expressly held to the contrary in an earlier opinion in *Gill*, determining that the plaintiff there had adequately alleged proximate causation through <u>financial service</u> allegations that were virtually identical to those in the FAC. *Gill v. Arab Bank, PLC* (*Gill I*), 891 F. Supp. 2d 335, 381 (E.D.N.Y. 2012). *See also*, *Weiss III*, 278 F. Supp. 3d at 641-642 (finding that, because "the Second Circuit [in *Al Rajhi Bank*] did not address whether banking services [at issue] were no longer 'routine' if the bank had knowledge of the ultimate use of the funds[,]" the decision rendered in *Weiss I* "on the scope of 'routine banking business' <u>stands</u>.") (emphasis added); *Weiss I*, 453 F. Supp. 2d at 625 ("Where the Bank knows that the groups to which it provides services are engaged in terrorist activities even the provision of basic banking services may qualify as material support.") (internal quotations and citations omitted); *Linde I*, 384 F. Supp. 2d at 588 (holding that "the banking activities of receiving deposits and transmitting funds between accounts" where "the accounts (and funds) belong to groups engaged in terrorist activity" or are "charity fronts that operate as agents of HAMAS" creates ATA liability under § 2339C).

Defendant improperly relies on *Rothstein v. UBS AG*, 708 F.3d 82 (2d.Cir. 2013) and *Terrorist Attacks on September 11, 2001 v. Al Rajhi Bank* (*Al Rajhi Bank*), 714 F.3d 118 (2d. Cir. 2013) – insisting that said opinions are instructive here since the FAC fails to credibly allege that "banking conduct led directly to the terrorist attacks at issue." But *Rothstein* and *Al Rajhi Bank* are easily distinguished from this case, as was recently stressed by the court in *Weiss III* – which defendant tellingly refrains from referencing in its moving papers. *See Weiss III*, 278 F. Supp. 3d at 642-643.

---

[13] Defendant relies on the decision, at the summary judgment stage, in *Gill v. Arab Bank, PLC* (*Gill III*), 893 F. Supp. 2d 542 (E.D.N.Y. 2012), which is inapplicable to the present motion to dismiss as plaintiffs therein had an opportunity to conduct discovery.

As was the case in *Weiss III*, the FAC alleges that Arab Bank (and particularly ABNY) was responsible for facilitating transfers of essential U.S. dollars to and from HAMAS alter egos including the Committee during the precise time period in which the Egged Bus Bombing was carried out by HAMAS.  (FAC at ¶¶ 44, 87-89, 95-97, 103, 107-109, 112-113, 116-129).

 These particularized factual allegations are in stark contrast to those in *Rothstein* and *Al Rajhi Bank*. *See Rothstein*, 708 F.3d at 85-86, 92-93, 97 (affirming dismissal where plaintiffs failed to plausibly allege that U.S. currency the defendant bank provided to Iran – a foreign government with many legitimate funding objectives, which did not carry out the Hamas/Hezbollah attacks in question and which was not an agent of either terrorist entity –  was used in furtherance of the attacks at issue); *Al Rajhi Bank*, 278 F. Supp. 3d at 123-124 (affirming dismissal where plaintiffs never alleged that the bank defendants provided money directly to al Qaeda or that the monies they did allegedly donate to charity organizations known to support terror were actually transferred to al Qaeda during the general time period of the September 11, 2001 attacks).

Indeed, in the present case, it is uncontested that the Egged Bus Bombing was perpetrated by HAMAS. (Def's Br. at p. 15). Further, plaintiffs have plainly and plausibly alleged that the Bank facilitated transfers of financing (in U.S. dollars) that directly funded the attack in question – namely the Alleged Bader Transfer(s). (FAC at ¶¶ 44, 73, 116, 120-122).

In fact, following the reasoning in *Weiss I* and *Weiss III*, any one of the following categories of transfers detailed in the FAC would be legally sufficient to support a finding of proximate causation: (i) the HAMAS Leadership Transfers (dozens of transfers, totaling nearly $600,000 from 2000-2002); (ii) the Hamdan Transfers (transfers effectuated from 1998 to 2004 on one of eleven accounts from which more than $2,500,000 was funneled to designated

terrorists); and (iii) the HAMAS Alter Ego Transfers (countless transfers facilitated throughout the duration of the Second Intifada, totaling at least $32,000,000). *See Weiss III*, 278 F. Supp. 3d at 643 ("The social services provided by Hamas and its front groups are integral to building popular support for its organization and goals, which then facilitates its ability to carry out violent attacks") (citing *Boim III*, 549 F. 3d at 698); *Weiss I*, 453 F. Supp. 2d at 626 ("Because 'Congress [in promulgating the ATA] determined that foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct . . . Congress was compelled to attach liability to all donations to foreign terrorist organizations' regardless of the giver's intent.") (quoting *Boim III*, 291 F.3d at 1027).

Defendant argues, without authority, that the FAC must set forth allegations capable of supporting an inference that the Egged Bus Bombing "'would not have occurred' in the absence of – that is, but for – the defendant's conduct." (Def's Br. at p. 16) (citation omitted).  This is not, and cannot be, the law. *See, e.g.*, *Gill I*, 891 F. Supp. 2d at 367 ("'But for' cause cannot be required in the section 2333(a) context.").

The reasoning behind this rule is clear, as "requiring an ATA plaintiff, at least in the material support context, to prove but-for causation would come up against the basic problem of fungibility of money." *Id.  See also*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010) (citation and internal quotation omitted). After all, FTOs, like HAMAS, are not in the practice of maintaining organizational firewalls or otherwise engaging in the use of recognized and transparent accounting practices capable of tracing their fungible assets. *Holder*, 561 U.S. at 30. Nor do they maintain "legitimate *financial* firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations." *Id.* at 31.

This makes it exceedingly difficult, if not impossible, to trace the terrorist activities of these organizations to specific contributions. Hence, Congress opted to create an ATA remedy capable of imposing liability up the "causal chain of terrorism" to "imperil the flow of money." S. Rep. No. 102-342 (1992). To now impose a "but for" requirement would thwart the intent of Congress. It is for precisely this reason that no court has adopted the Bank's position that the ATA civil remedy requires a showing of "but for" causation.

Accordingly, plaintiffs respectfully submit that FAC sufficiently alleges that the Bank's acts of "international terrorism" were a proximate cause of the Egged Bus Bombing. This is the only showing necessary with regard to causation.

### C. Plaintiffs Have Sufficiently Pled their Secondary Liability Claims (Counts IV-V)

Under § 2333(d) plaintiffs need not show that the Bank's conduct constituted "international terrorism" or was otherwise a proximate cause of the Egged Bus Bombing, in order to establish secondary liability. *See Linde II*, 882 F. 3d at 328 (holding that "under an aiding and abetting theory of ATA liability, plaintiffs would not have to prove that the bank's own acts constitute international terrorism satisfying all the definitional requirements of § 2331(1)"); *Linde I*, 384 F. Supp. 2d at 584-585 (finding that there is no causation requirement in the context of an ATA aiding and abetting claim).

In September 2016, Congress enacted the Justice Against Terrorism Act ("JASTA")[14], Pub. L. No. 144-22, 130 Stat. 854 (Sept. 28, 2016), which incorporated § 2333(d) into the ATA, and provided that secondary ATA "liability may be asserted as to any person who aids and abets,

---

[14]     JASTA's provisions apply in any action "pending on . . . the date of [its] enactment" and which "aris[es] out of an injury to a person, property, or business on or after September 11, 2001." JASTA § 7. The present action satisfies both of these criteria.

by knowingly providing substantial assistance, or who conspires with <u>the person who committed</u> <u>such an act of international terrorism.</u>" 18 U.S.C. § 2333(d)(2) (emphasis added).

The purpose of JASTA is to "<u>provide civil litigants with the broadest possible basis</u>, …, <u>to seek relief against persons, entities, and foreign countries</u>, …, <u>that have provided material</u> <u>support, directly or indirectly, to foreign organizations or persons that engage in terrorist</u> <u>activities against the United States.</u>"  JASTA § 2b (emphasis added). Congress also made clear that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) "provides the proper legal framework for how such liability should function . . .." JASTA § 2(a)(5) (emphasis added).

Arab Bank argues that "few courts have interpreted § 2333(d)(2) since its adoption" and that it would "ignore the legal framework set forth in *Halberstam*" for this Court to "stretch liability" to the Bank for the conduct alleged in the FAC. (Def's Br. at pp. 19-20). This argument is without merit since the *Linde I* Court previously utilized the *Halberstam* framework to assess allegations virtually identical to those set forth in the FAC against the same defendant, and unequivocally determined that they were "sufficient to establish secondary [common law] liability . . .." *Linde I*, 384 F. Supp. 2d at 584. Although *Linde I* was decided prior to JASTA, the same result should undoubtedly follow here.

Equally unavailing is defendant's repeated suggestion that plaintiffs' allegations regarding the Bank's knowing provision of substantial assistance to, and conspiracy with, the Saudi Committee cannot be used in assessing whether plaintiffs have sufficiently pled their claims for secondary ATA liability, because the "the Saudi Committee is not 'the person who committed' the [Egged Bus Bombing], as is required to state a claim under § 2333(d)(2)." (Def's Br. at pp. 22, 24).  Indeed, this District has repeatedly held that, where a complaint sets forth allegations that certain purportedly "charitable" organizations were, and were known to be,

controlled by HAMAS or its agents, "those allegations are sufficient, on a motion to dismiss, to show that the organizations [we]re [known] agents of HAMAS[.]" *Weiss I*, 453 F. Supp. 2d at 622-623. *See also*, *supra*, n. 12. Moreover, the term "person", as utilized in § 2333(d)(2), is understood to encompass the plural, meaning that the actions of Misk, Bader, Qawasmeh and the Convicted HAMAS Operatives are appropriately imparted to HAMAS as a whole. *See* 18 U.S.C. § 2333(d)(1); 1 U.S.C. § 1.

The FAC's allegations of conduct on the part of the Saudi Committee and other HAMAS alter egos are equivalent to allegations of conduct on the part of HAMAS itself and are sufficient to impart secondary liability upon the Bank. As such, plaintiffs respectfully submit that the JASTA conspiracy and aiding and abetting claims should not be dismissed.

### 1. Plaintiffs Plausibly Allege that the Bank Conspired with "The Person Who Committed" the Egged Bus Bombing

To state a claim for conspiracy under § 2333(d)(2), plaintiffs must allege: (1) the existence of a tacit or explicit conspiratorial agreement between the Bank and HAMAS or its known agents to engage in "an unlawful act or a lawful act in an unlawful manner"; (2) "an overt act performed by one of the parties to the agreement", undertaken "in furtherance of the common scheme"; and (3) resultant injury caused by said act. *Halberstam*, 705 F.2d at 477-478, 487.

Defendant argues that the FAC contains no plausible allegations of a "shared goal" between the Bank and HAMAS, nor any alleged factual bases upon which to infer the existence of a tacit "conspiratorial agreement" between the two to commit acts of international terrorism. (Def's Br. at pp. 21-22). However, any fair reading of the FAC compels a contrary conclusion.

Plaintiffs allege that the Saudi Committee was founded to function as a fundraising apparatus to subsidize and finance HAMAS' terrorist objectives during the Second Intifada. (FAC at ¶¶ 79-82). The FAC further alleges that the Bank's founders harbored anti-Zionist

ideals in line with those of HAMAS, and were actively involved in the creation of the Committee, having grown frustrated by the absence of a mechanism through which to convert and transfer mounting donations received in Saudi currency into U.S. dollars for use in furtherance of the Second Intifada. (*Id.* at ¶¶ 76-80, 95-96).   Thereafter, with the clear understanding that the Saudi Committee was pervasively controlled by HAMAS, the Bank is alleged to have willingly agreed to provide the Committee with banking and administrative services capable of financing HAMAS' terrorist objectives with U.S. dollars. (*Id.* at ¶¶ 51-53, 79-82, 95-96, 103).   The FAC also alleges that the Bank agreed to underwrite and serve as the exclusive administrator of the Committee's illicit Martyr Insurance Program, the purpose of which was to encourage, induce and incentivize participation in HAMAS' reign of terror during the Second Intifada. (*Id.* at ¶¶ 79-82, 86, 96).

These factual allegations, when accepted as truth as required in this context, are more than sufficient to carry plaintiffs' burden under the *Halberstam* framework, just as they were in *Linde I*:

> The factual allegations of the complaints sufficiently support an inference that Arab Bank and the terrorist organizations were participants in a common plan under which Arab Bank would supply necessary financial services to the organizations which would themselves perform the violent acts. Administering the death and dismemberment benefit plan further supports not only the existence of an agreement but Arab Bank's knowing and intentional participation in the agreement's illegal goals. No more is required.

*Linde I*, 384 F. Supp. 2d at 584 (emphasis added).

Plaintiffs go beyond what is required by incorporating extensive allegations regarding the findings set forth in the OCC's Consent Order and its Joint Release with FinCEN,[15] the detailed

---

[15]      Defendant repeatedly attempts to downplay the import of the 2005 Consent Order and Joint Release. To support this position, it points to Judge Weinstein's opinion granting the Bank's motion for summary judgment in *Gill III*. What defendant fails to mention is that the Consent Order and Joint Release were a "critical aspect of the litigation" in *Gill*, and were deemed a sufficient factual predicate to support plaintiff's allegations of knowledge on

recordkeeping procedures necessitated from the Bank in administering the Martyr Insurance Program, and the routine cooperation and interaction between the Bank and the Committee throughout the Second Intifada – providing this Court with even further grounds upon which to reasonably infer the existence of a conspiratorial agreement. (See FAC at ¶¶ 45-46, 90-95, 100). *See also*, *Halberstam*, 705 F.2d at 486) ("[C]ourts have to infer an agreement from indirect evidence in most civil conspiracy cases. The circumstances of the wrongdoing generally dictate what evidence is relevant . . . in deciding whether an agreement exists.").

The Bank, nevertheless, falsely contends that the FAC fails to state a conspiracy claim in that it does not "plausibly allege that the financial services provided by the Bank were pivotal to the 'success' of Hamas terrorism at the time of the [Egged Bus Bombing]." (Def's Br. at p. 22) (citing *Halberstam*, 705 F.2d at 477-478). First, the FAC does allege that the Bank's role was critical to HAMAS' success. (*See, e.g.*, FAC at ¶¶ 95, 104). Secondly, *Halberstam* imposes no such causation requirement. In fact, the Second Circuit has expressly rejected the notion that JASTA requires any form of causation. *Linde II*, 882 F.3d at 318 ("Nor are we persuaded to reverse by Arab Bank's sufficiency challenge to the proof of causation because causation would not be in dispute if the bank is considered an aider and abettor of Hamas acts of terrorism, as plaintiffs can now maintain under JASTA.").

What JASTA does necessitate is a plausible showing that Arab Bank "agreed to participate in an unlawful course of action and that" plaintiffs' injuries were "a reasonably foreseeable consequence of the scheme . . .." *Halberstam*, 705 F.2d at 487. The FAC plainly

---

the part of the Bank at the motion to dismiss stage of the *Gill* litigation. *See Gill v. Arab Bank, PLC* (*Gill I*), 891 F. Supp. 2d 335, 339, 382-382 (E.D.N.Y. 2012). What's more, the plaintiff in *Gill* was injured in a 2008 terrorist attack, and the *Gill III* Court expressly determined that the Consent Order and Release "sp[oke] to the Bank's conduct during and before 2004, but not after." *Gill III*, 893 F. Supp. 2d at 566 (note also that defendant deceptively misquotes the Consent Order, omitting that the Bank's supposed cessation of clearing was instead only "largely compliant). Contrary to *Gill*, the Consent Order and Joint Release speak directly to the Bank's knowledge in this action.

satisfies these requirements in alleging that: (1) the Bank's activities were symbiotic with those of HAMAS (FAC at ¶¶ 79-83, 90-97, 100, 106-110, 112-114, 116-129); accord *Halberstam*, 705 F.2d at 487); (2)  the Bank was pursuing the objective to obtain territorial concessions from the Israeli government by way of violence and encouragement of same (FAC at ¶ 51-53, 55-58, 75-82, 106-110, 112-114, 116-129); accord *Halberstam*, 705 F.2d at 487); (3) the Bank would allegedly "consult[] with the Saudi Committee and local representatives of HAMAS . . . to confirm and approve the lists" of martyrs and their beneficiaries qualifying for benefits under the illicit Martyr Insurance Program (FAC at ¶ 90-91; accord *Halberstam*, 705 F.2d at 487); and (4) the scheme was longstanding and prolific in nature, with the Bank alleged to have facilitated the transfer of at least $15,000,000 to HAMAS via the Saudi Committee (and at least another $17,000,000 more for the other HAMAS alter egos) (FAC at ¶¶ 55-56, 60, 106-107, 116-129); accord *Halberstam*, 705 F.2d at 487).

It is undisputed that the Egged Bus Bombing constituted an overt act by one of the parties to the agreement (i.e., HAMAS) in furtherance of same, the resultant consequences of which (i.e., plaintiffs' injuries) were reasonably foreseeable as a result of the scheme's design and purpose (FAC at ¶ 75; accord *Halberstam*, 705 F.2d at 487).  The Bank's misplaced reliance, again, on *Gill v. Arab Bank, PLC* (*Gill III*), 893 F. Supp. 2d 542, 556 (E.D.N.Y. 2012), a case decided on summary judgment, cannot support dismissal of this claim.

### 2.  Plaintiffs Plausibly Allege that the Bank  Aided and Abetted "The Person Who Committed" the Egged Bus Bombing

To state a claim for aiding and abetting under § 2333(d)(2), plaintiffs must allege that: (1) the Bank aided and abetted HAMAS; (2) in doing so, Arab Bank was "generally aware" that it was assuming a "role" in "overall" terrorist activities; and (3) the Bank's aid to HAMAS

constituted "substantial assistance" with respect to the Egged Bus Bombing. *Halberstam*, 705 F.2d at 477-478; *Linde II*, 882 F.3d at 329.

Recognizing that "liability for aiding-abetting often turns on how much encouragement or assistance is substantial enough," defendant conflates the applicable standard – insisting that *Halberstam* requires a showing that "the aid provided was a 'substantial factor' in causing the Plaintiffs' injuries," that is, a proximate cause of the Egged Bus Bombing. (*Halberstam*, 705 F.2d at 478; Def's Br. at pp. 22-23). Once again this is not the applicable standard. *Linde II*, 882 F.3d at 318, 330-331 (noting the distinction between "the substantiality inquiry for causation" and the "substantiality inquiry for aiding and abetting", which merely "focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct" as a whole).

Instead, as *Halberstam* and its progeny make clear, the determination as to whether defendant's alleged assistance to HAMAS was sufficiently "substantial" to sustain a claim for JASTA aiding and abetting should be assessed through the application of the following six factors: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance. *Id.* at 329. *See also*, *Halberstam*, 705 F.2d at 478. Such an exercise compels a conclusion that the allegations of the FAC (set forth in detail above in Section C. 1.) satisfy the "substantial assistance" requirement for JASTA aiding and abetting liability.

As was the case in *Halberstam*, the Bank is herein alleged to have served as a willing participant in an illicit campaign having allegedly enabled HAMAS to sustain the Second Intifada through its expedient conversion and transfer of financing (totaling at least $32,000,000)

(Factors 1, 2 and 6) (FAC at ¶¶ 79-83, 90-97, 100, 106-110, 112-114, 116-129); accord *Halberstam*, 705 F.2d at 488. Said financing was provided directly to HAMAS through its known alter egos, including the Saudi Committee – an organization that the Bank understood to be pervasively controlled by HAMAS, and on behalf of which it voluntarily administered the illicit Martyr Insurance Program,. (Factors 4 and 5) (FAC at ¶ 51-53, 79-83, 90-97, 100, 106-110, 112-114, 116-129); accord *Halberstam*, 705 F.2d at 488). And while the Bank, like Hamilton, was admittedly not present at the time of the primary violation, the FAC plainly alleges that HAMAS was dependent upon transfers from ABNY to fund its terrorist operations during the Second Intifada, and that the Bank directly facilitated the Egged Bus Bombing through such transfers to HAMAS. (Factor 3). (FAC at ¶¶ 51-53, 79-83, 90-97, 100, 103-104, 106-110, 112-114, 116-129); accord *Halberstam*, 705 F.2d at 488).

Such direct, knowing, and purposeful involvement on the part of the Bank is far less attenuated than that in *Halberstam*, and undoubtedly constitutes "substantial assistance" under the applicable framework.

A similar conclusion is warranted with regard to the "general awareness" requirement for aiding and abetting liability. This prong only requires factual allegations sufficient to support an inference that the Bank "was 'generally aware' that it was thereby playing a 'role' in Hamas's violent or life-endangering activities." (Def's Br. at p. 24; *Cf Linde II*, 882 F. 3d at 329). In fact, the Second Circuit has expressly made clear that the "general awareness" prong does not "require proof that Arab Bank knew of the specific attacks at issue when it provided financial services to Hamas." *Linde II*, 882 F. 3d at 329.

As set forth in greater detail in the preceding section, the FAC plainly satisfies this requirement. Indeed, the Second Circuit in *Linde II* noted that the FAC's allegations regarding

the Hamdan Transfers alone "might permit a jury, properly instructed as to aiding and abetting, to infer the requisite awareness." *Id.* at 330.  As such, the knowledge allegations set forth in the FAC are sufficient to satisfy the existence of the requisite "general awareness of the Bank. (FAC at ¶¶ 45-46, 57, 75-83, 90-98, 106, 116-129).

Plaintiffs' aiding and abetting analysis is further supported by the decision in *Linde I*, which held:

> The complaints allege that the financial services provided by Arab Bank, and the administration of the death and dismemberment benefit plan, provided substantial assistance to international terrorism. They also allege that the Bank's administration of the benefit plan encouraged terrorists to act.  These allegations are well within the mainstream of aiding and abetting liability. They describe the wrongful acts performed by the terrorists, the defendant's general awareness of its role as part of an overall illegal activity, and the defendant's knowing and substantial assistance to the principal violation. With respect to the defendant's administration of the death and dismemberment benefit plan . . . [a]dvice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance.  * * * The Bank's active participation in creating such an incentive is a sufficient basis for liability under the broad scope of the ATA, which imposes secondary liability on those who substantially assist acts of terrorism.

*Linde I*, 384 F. Supp. 2d at 584-585 (citations and internal quotations omitted). A similar result should follow here.

After all, *Halberstam* stands for the general proposition "that a person who assists a tortious act may be liable for other reasonably foreseeable acts done in connection with it." *Halberstam*, 705 F.2d at 484.  Here, there can be no question that violent terrorist attacks are as foreseeable and direct a consequence of providing tens of millions of dollars to HAMAS during the Second Intifada as murder was deemed to have been in *Halberstam* with regard to burglary and armed robbery. *Id.* at 488.  As such, plaintiffs respectfully submit that they have sufficiently pled their civil aiding and abetting claim pursuant to JASTA

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that this Honorable Court deny defendant's Motion to Dismiss the FAC.

Dated: August 2, 2018                    Respectfully submitted,


**HERZFELD & RUBIN, P.C.**


*/s/ Michael R. Rudick*

Brian T. Carr, Esq. (BC-2519)
Michael R. Rudick, Esq. (MR-1785)
HERZFELD & RUBIN, P.C.
*Attorneys for Plaintiffs*
125 Broad Street
New York, New York 10004
(212) 471-8500
bcarr@herzfeld-rubin.com
mrudick@herzfeld-rubin.com